**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| L. HART, INC.; R & D MARKETING, LLC; TIMBER LAKE FOODS, INC.; and EMA FOODS CO., LLC;<br><br>       Plaintiffs,<br><br>v.<br><br>PILGRIM'S PRIDE CORPORATION; AGRI STATS, INC.; CASE FOODS, INC.; CASE FARMS, LLC; CASE FARMS PROCESSING, INC.; CLAXTON POULTRY FARMS, INC.; NORMAN W. FRIES, INC.; FOSTER FARMS, LLC; FOSTER POULTRY FARMS; HARRISON POULTRY, INC.; HOUSE OF RAEFORD FARMS, INC.; KEYSTONE FOODS LLC; EQUITY GROUP EUFAULA DIVISION, LLC; EQUITY GROUP KENTUCKY DIVISION LLC; EQUITY GROUP—GEORGIA DIVISION LLC; KOCH FOODS, INC.; JCG FOODS OF ALABAMA, LLC; JCG FOODS OF GEORGIA, LLC; KOCH MEAT CO., INC.; MAR-JAC POULTRY, INC.; MAR-JAC POULTRY MS, LLC; MAR-JAC POULTRY AL, LLC; MAR-JAC AL/MS, INC.; MAR-JAC POULTRY, LLC; MAR-JAC HOLDINGS, LLC; MOUNTAIRE FARMS, INC.; MOUNTAIRE FARMS, LLC; MOUNTAIRE FARMS OF DELAWARE, INC.; O.K. FOODS, INC.; O.K. FARMS, INC.; O.K. INDUSTRIES, INC.; PERDUE FARMS, INC.; PERDUE FOODS, LLC; SANDERSON FARMS, INC.; SANDERSON FARMS, INC. (FOODS DIVISION); SANDERSON FARMS, INC. (PRODUCTION DIVISION); SANDERSON FARMS, INC. (PROCESSING DIVISION); SIMMONS FOODS, INC.; SIMMONS PREPARED FOODS, INC.; TYSON FOODS, INC.; TYSON CHICKEN, INC.; TYSON BREEDERS, INC.; TYSON POULTRY, INC.; and WAYNE FARMS, LLC<br>       Defendants. | **COMPLAINT**<br><br>**Jury Trial Demanded** |

**PLAINTIFFS' COMPLAINT
AND DEMAND FOR JURY TRIAL**

**(REDACTED VERSION)
(MOTION TO FILE UNREDACTED VERSION UNDER SEAL PENDING)**

## TABLE OF CONTENTS

I.     SUMMARY OF FACTUAL ALLEGATIONS ........................................................ 6

    A.     Overview of the Broiler Industry ........................................................ 6

    B.     Summary of Defendants' Conspiracy .................................................. 7

    C.     Defendants' Coordinated Supply Restrictions ................................... 9

    D.     Defendants' Manipulation of the Georgia Dock Price Index ..................... 11

    E.     Defendants' Bid-Rigging Conduct ..................................................... 12

II.     PARTIES ................................................................................................ 14

    A.     Plaintiffs ............................................................................................ 14

    B.     Defendants ........................................................................................ 15

       1.     Agri Stats ................................................................................ 15

       2.     Case ......................................................................................... 16

       3.     Claxton .................................................................................... 16

       4.     Foster Farms ........................................................................... 17

       5.     Harrison .................................................................................. 18

       6.     House of Raeford .................................................................... 18

       7.     Keystone Foods ...................................................................... 18

       8.     Koch ........................................................................................ 20

       9.     Mar-Jac ................................................................................... 21

       10.     Mountaire ............................................................................... 21

       11.     O.K. Foods .............................................................................. 22

       12.     Perdue ..................................................................................... 22

       13.     Pilgrim's Pride ....................................................................... 23

       14.     Sanderson ................................................................................ 23

       15.     Simmons .................................................................................. 24

       16.     Tyson ...................................................................................... 25

          17.     Wayne ................................................................................... **26**

**III.**    **Producer Co-Conspirators** ................................................................ **27**

    **A.**    **Producer Co-Conspirator Allen Harim** .................................... **27**

    **B.**    **Producer Co-Conspirator Amick** ............................................ **28**

    **C.**    **Producer Co-Conspirator Fieldale** ......................................... **28**

    **D.**    **Producer Co-Conspirator George's** ........................................ **29**

    **E.**    **Producer Co-Conspirator Marshall Durbin** ........................... **30**

    **F.**    **Producer Co-Conspirator Peco** .............................................. **31**

    **G.**    **The Defendant Family Co-Conspirators** ................................ **31**

          **1.**     Koch ...................................................................... **31**

          **2.**     Tyson .................................................................... **36**

          **3.**     Perdue ................................................................... **37**

          **4.**     Wayne Farms ......................................................... **38**

          **5.**     Pilgrim's Pride ...................................................... **38**

          **6.**     Foster Farms ......................................................... **39**

          **7.**     O.K. Foods ............................................................ **39**

          **8.**     House of Raeford ................................................... **40**

          **9.**     Keystone Foods ..................................................... **41**

**IV.**    **NON-PRODUCER CO-CONSPIRATORS TIP TOP POULTRY, INC., SOUTHERN HENS, INC. AND RABOBANK** ................................................................... **41**

**V.**    **JURISDICTION AND VENUE** ......................................................... **43**

**VI.**    **TRADE AND COMMERCE** ............................................................. **44**

**VII.**    **FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY47**

    **A.**    **Production Cutting** ................................................................ **49**

          **1.**     **In an Early Phase of their Conspiracy, Defendants Departed from Their Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts** ................................................ **49**

2.           **Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary**...............................................................**51**

B.       **Defendants Begin to Cut Production in Concert** ........................................ **54**

C.       **Defendants' First Round of Chicken Production Cuts Included Unprecedented Reductions to Chicken Breeder Flocks**........................................................ **66**

D.       **Defendants Continued Their Conspiracy With A Second Massive Breeder Flock Cull in 2011** ........................................................................................................ **69**

E.       **Drastically-Reduced Breeder Flocks Boosted Chicken Prices And Raised Defendants' Profits to Record Levels** ................................................................................. **82**

F.       **Defendants utilized Urner Barry to assist them capitalize on their supply reduction efforts** ...................................................................................................... **89**

G.       **Defendants Capitalized on Their Prior Actual Reduction of Broilers to Coordinate a False Supply Reduction**........................................................................... **93**

H.       **The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the Georgia Dock Price Index**................................................................... **94**

I.       **The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry** .. **102**

J.       **The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry** ............................................. **107**

K.       **The Georgia Dock Became Ripe for Manipulation** ................................................. **109**

L.       **Regulatory Investigation and Demise of the Georgia Dock**...................................... **112**

M.       **The Georgia Dock Price Index Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2011** .................................................................. **116**

N.       **Defendants and Co-Conspirators Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to Be Artificially High** ..................... **118**

1.           **Pilgrim's fraudulently made false submissions to the Georgia Dock** ..........**120**

2.           **Koch fraudulently made false submissions to the Georgia Dock** .................**127**

3.           **Mar-Jac fraudulently made false submissions to the Georgia Dock** ...........**131**

4.           **Harrison fraudulently made false submissions to the Georgia Dock**...........**133**

5.           **Sanderson Farms fraudulently made false submissions to the Georgia Dock** ...............................................................................................**138**

6.           **Tyson fraudulently made false submissions to the Georgia Dock**................**142**

7.      Claxton fraudulently made false submissions to the Georgia Dock.............144

8.      Wayne Farms fraudulently made false submissions to the Georgia Dock ..147

9.      Fieldale Farms also made false submissions to the Georgia Dock ..............149

O.      The Georgia Dock Defendants Fraudulently Failed to Inform their customers of their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock.......................................................... 151

P.      The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market.................... 157

Q.      Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations ................................................................. 159

R.      Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So ...................................................................... 160

S.      Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs ................................................................................. 162

T.      The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith .... 164

U.      Defendants used the Georgia Dock Manipulation To Impact Higher Prices Charged to Contract Purchasers ................................................................................. 166

V.      Defendants' Bid-Rigging Conduct ................................................................ 167

W.      The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion ................................................................................................ 171

X.      Defendants Collusively Adopted Additional Strategies To Reinforce Their Conspiracy ................................................................................................................. 186

Y.      Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy . 193

Z.      Plaintiffs' Claims are Timely........................................................................ 210

VIII.   ANTITRUST IMPACT................................................................................... 217

IX.     CLAIMS FOR RELIEF AND CAUSES OF ACTION ....................................... 217

        COUNT I VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS) ................... 217

        COUNT II VIOLATION OF 15 U.S.C. § 1 ........................................................... 219

Plaintiffs L. Hart, Inc., R & D Marketing, LLC, Timber Lake Foods, Inc., and EMA Foods Co., LLC (collectively, "Plaintiffs"), bring this action for damages under the antitrust laws of the United States against the above-captioned Defendants and allege:

## I.    SUMMARY OF FACTUAL ALLEGATIONS

### A.    Overview of the Broiler Industry

1.     This is a case about how some of America's chicken producers reached illegal agreements and restrained trade beginning at least as early as 2008 through at least early 2019. Through those unlawful agreements, and other anticompetitive actions, Defendants and their co-conspirators conducted a long-running conspiracy to restrain production, manipulate price indices, fix prices, and rig bids, the purpose and effect of which was to fix, raise, stabilize, and maintain prices of chicken meat throughout the United States.

2.     Defendants' restraint of trade was multi-faceted and involved many overt acts. They focused on the distribution chain by reducing the supply of broiler chickens into the market. They also rigged bids on broiler chicken sales. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index—specifically, the Georgia Dock price index—with respect to the prices of chicken they sold to purchasers. Defendants all had the common objective of disrupting free market competition to harm purchasers.

3.     Four of the participants in the alleged conspiracy—Fieldale Farms, Peco, George's, and Amick—have already agreed to pay millions to settle claims by a putative class of direct purchasers alleging that they participated in this conspiracy. At least Fieldale Farms and Amick have entered into confidential settlement agreements with various Direct Action Plaintiffs ("DAPs") who have filed their own separate lawsuits against Defendants.

4. Senior executives from at least five of the Defendants are already under criminal indictment by the United States Department of Justice in connection with their roles in the conspiracy, and the Department of Justice also made clear that its investigation is ongoing.

5. "Broilers," "chickens," or "broiler chickens" are "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards."[1] See November 20, 2017 Memorandum Opinion and Order (D.E. 541) at 2-3.[2] Broiler chickens constitute approximately 98% of all chicken meat sold in the United States. The broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.

6. Defendants own or tightly control all aspects of broiler chicken production, including the laying of eggs; the hatching of chicks; the raising of chicks; the slaughtering of chickens; and processing and distributing the meat. The technology and process of industrial-scale broiler chicken production is well known among Defendants, and all Defendants use the same types of equipment and processes.

7. High barriers to entry exist in the broiler chicken market. Entry into the market would cost in excess of $100 million, and no company has created a new poultry company from scratch in decades.

**B.     Summary of Defendants' Conspiracy**

---

[1] This definition should not be construed to exclude chicken sold according to halal, kosher, free range, or organic standards when it would apply to all or substantially all of the chicken produced by any Defendant.

[2] *In re Broiler Chicken Antitrust Litigation*, Case No. 16-cv-08637 (N.D. Ill.).

8.      Defendants used multiple means to sustain their conspiracy/conspiracies. For example, they focused on the distribution chain by reducing the supply of broiler chickens into the market. Defendants coordinated to monitor each others' supply and purposefully destroyed breeder hens and eggs to achieve these artificial decreases in broiler supply. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index—specifically, the Georgia Dock price index—with respect to the prices of chicken they sold to purchasers. Defendants also rigged bids on broiler chicken sales. While Defendants may have utilized multiple avenues, they all had the common objective of disrupting free market competition to harm purchasers.

9.      "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. Numerous "plus factors" existed in the broiler industry during the relevant period including, but not limited to: (i) direct communications between Defendants regarding confidential production information which allowed Defendants to disseminate actual and false information regarding supply reductions to purchasers of broilers; (ii) coordinated manipulation by Defendants of the Georgia Dock price index; (iii) Defendants' coordinated conduct to rig bids to restaurants and other contract purchasers of broilers; (iv) extensive information sharing through Agri Stats and other means; (v) numerous opportunities for Defendants to collude in a variety of forums; (vi) inter-Defendant trades and purchases that often were against independent self-interest; (vii) increased exports of broilers to other countries that were also often against independent self-interest; and (viii) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for

chicken, depressed economic conditions, and a history of government investigations and collusive conduct.

**C.      Defendants' Coordinated Supply Restrictions**

10.      Defendants curtailed the supply of chickens in the market on the front end via coordinated and unprecedented cuts at the top of the supply chain. This included the coordinated and collusive reduction of production capacity and jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.

11.      Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants. These mechanisms still allowed Defendants to ramp up production within weeks if market conditions changed.

12.      Prior to the relevant period, Defendants' pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers."

13.      A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."

14.      In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks.

15.      Defendants abandoned their traditional, short-term production cuts and instituted material changes that increased ramp-up times by up to 18 months. This was a significant shift in their behavior and signaled their commitment to the conspiracy.

16.     Defendants' collective market-changing cuts to breeder flocks—a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade—effectively eliminated each Defendant's ability to meaningfully increase supply for years.

17.     Defendants' joint efforts to impose supply-side "discipline" included, among other things, open signaling in the form of public statements by their senior executives about their individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" across the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice. Indeed, Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."

18.     Defendants were able to facilitate, monitor and police their coordinated output restriction scheme by, among other things, communicating through third parties including Agri Stats and Urner Barry (a private commodity price reporting service).

19.     Defendants also were able to facilitate, monitor and police their coordinated output restriction scheme by using reports purchased, at significant cost, from Agri Stats, a former subsidiary of global pharmaceutical company Eli Lilly & Co.

20.     Agri Stats collected detailed, proprietary data from all Defendants, including date detailing the housing used, breed of chicks, average size, and production and breeder flock levels.

21.     The Agri Stats data was in theory supposed to be anonymized. But by design, Defendants could identify and track their purported competitors' production and output activities to ensure that others were following suit on implementing the coordinated output restrictions.

Defendants devoted significant time and resources to working collectively to de-anonymize Agri Stats data.

22.     Defendants' coordinated effort reflected their expectation that higher profit margins would result from coordinated production cuts. Defendants expected that coordinated production cuts would also allow them to more quickly capitalize on those inflated non-competitive prices.

23.     Later in the relevant period, Defendants capitalized on their prior actual reduction of broilers to coordinate a false supply reduction, again with the same goal—to use the perceived reduction of supply to justify anticompetitive price increases of broilers.

**D.     Defendants' Manipulation of the Georgia Dock Price Index**

24.     Another aspect of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Poultry Market News division (the "PMN") of the Georgia Department of Agriculture (the "GDA").

25.     Starting in 2008, the Defendants also began moving away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several purportedly "fair" price indices. They made this move away from fixed-price contracts particularly with respect to certain distributor and grocer customers.

26.     Many chicken buyers across the nation paid prices based on the Georgia Dock, while many more paid prices that were influenced by the Georgia Dock.

27.     Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price was a self-reported number from a group of chicken producers—Defendants Pilgrim's Pride, Tyson, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale (collectively, the "Georgia Dock Defendants").

11

28.     Senior executives from at least seven of the Georgia Dock Defendants were members of a private-sector "Poultry Market News Advisory Committee," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.

29.      Defendants—including both the Georgia Dock Defendants and the other Defendants—took advantage of the inflated, non-competitive prices reported on the Georgia Dock index. They used the inflated Georgia Dock prices to achieve higher prices for those purchasers who set their prices on purportedly "fair" price indices. Defendants also used the inflated prices reported on the Georgia Dock index to justify the higher prices they charged to their contract purchasers.

30.     In addition to their fraudulent submissions to the PMN, all of the Georgia Dock Defendants fraudulently misrepresented, omitted, and failed to disclose critical, non-public information about the Georgia Dock. In particular, they misrepresented that the Georgia Dock was or indicated the "market" price for broiler chicken, when in fact they knew they did not submit their own actual offering prices to the PMN. They also failed to disclose to purchasers their ability to control the PMN by virtue of the Advisory Committee (which consisted solely of executives of Georgia Dock Defendants), the fact that the Georgia Dock price each week was based solely on Defendants' bald assertions with no verification, and the fact that Defendants were manipulating the Georgia Dock price.

### E.     Defendants' Bid-Rigging Conduct

31.     Defendants also engaged in bid-rigging conduct targeted at restaurants and others that purchased broilers in large volumes. Starting as early as 2012 and continuing until at least as late as 2019 ("Bid-Rigging Conduct Period"), Defendants conspired to fix prices and submit artificially high bids to restaurants and other purchasers and others in an effort to drive up prices, and in turn, Defendants' profits.

12

32.     As a result of Defendants' bid-rigging conduct, Defendants were able to exact significant price increases from restaurants and other purchasers.

33.     Senior executives from Defendants Pilgrim's Pride, Claxton, Tyson, Perdue, Koch, Case, and George's have been indicted by the United States Department of Justice. The Department of Justice's investigation remains ongoing.

34.     All aspects of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; (f) extensive sharing about Broiler breederstock supply and slaughter levels, forecasting data, pricing inventory, and exports through the Strategic Alliance and Southern Hens, Inc.; and (g) access to competitors' data through Agri Stats.

35.     An internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation, "predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."

36.     Defendants' collusive agreements, anticompetitive acts, and understandings throughout the relevant period enabled Defendants, directly and through their wholly owned or controlled subsidiaries and affiliates, to reap the benefits of their illegal conduct through the sale of broiler chickens at inflated non-competitive prices. Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."

37.     Through their collusive, coordinated anticompetitive actions, Defendants negated the economic benefits of increased competition. Defendants' conduct resulted in their customers paying at least hundreds of millions of dollars in overcharges to Defendants.

## II.     PARTIES

### A.     Plaintiffs

38.     L. Hart, Inc. is a Mississippi corporation with its principal place of business in Water Valley, Mississippi.

39.     R & D Marketing, LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.

40.     Timber Lake Foods, Inc. is a Mississippi corporation with its principal place of business in Tupelo, Mississippi.

41.     EMA Foods Co., LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.

42.     During the Conspiracy Period, Plaintiffs purchased Broilers directly from certain Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators.

43.     Plaintiffs each purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Plaintiffs contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Plaintiffs with Broilers. As such, Plaintiffs have suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

44.     Plaintiffs were damaged by Defendants' anticompetitive and illegal conduct by

paying artificially inflated prices for Broilers. Plaintiffs bring this action to recover the overcharges they paid for Broilers purchased during the Conspiracy Period.

### B.    Defendants

45.    Below is a list of the Defendants in alphabetical order by Defendant family name.

#### 1.    Agri Stats

46.    Defendant Agri Stats, Inc. ("Agri Stats") is an Indiana corporation headquartered in Fort Wayne, Indiana, and a former subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.

47.    Agri Stats has knowingly played an important and active role in Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.

48.    In 2008 and 2010, a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations. Those were key years in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. These facts highlight the unique and symbiotic relationship between Agri Stats and the other Defendants.

### 2. Case

49.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the time period relevant to Plaintiffs' claims, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

50.     Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

51.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms Processing, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

52.     Case Foods reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.

53.     Defendants Case Foods, Inc., Case Farms, LLC and Case Farms Processing, Inc. are collectively referred to as "Case Foods."

### 3. Claxton

54.     Defendant Claxton Poultry Farms, Inc. is a Georgia corporation headquartered in Claxton, Georgia. Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the relevant time period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, in the United States. Defendants Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton." Claxton reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex. Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO also served on the Georgia Dock Advisory Committee. Claxton is a Georgia Dock Defendant and during the relevant period sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 4.     Foster Farms

55.     Defendant Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

56.     Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the relevant period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly owned or controlled affiliates, to

17

purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster" or "Foster Farms."

### 5. Harrison

57.     Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Committee. Harrison is a Georgia Dock Defendant.

### 6. House of Raeford

58.     Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

### 7. Keystone Foods

59.     Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig"). On November 30, 2018, Defendant Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig. Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities. Tyson Foods' acquisition of Keystone Foods LLC (and the three affiliated Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all

Keystone Foods, LLC's assets and liabilities, and Keystone Foods continued to exist as an operating entity subsequent to the acquisition.

60. Equity Group Eufaula Division, LLC is a Delaware limited-liability company with its headquarters in Bakerhill, Alabama and is a wholly owned subsidiary of Keystone Foods LLC.

61. Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky, and is a wholly-owned subsidiary of Grow-Out Holdings LLC. During the relevant period, Equity Group Kentucky Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

62. Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia, and is a wholly-owned subsidiary of Keystone Foods LLC. During the relevant period, Equity Group – Georgia Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

63. As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC.

64. Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group—Georgia Division LLC are collectively referred to as "Keystone Foods" in this Complaint.

65. Keystone Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Alabama, Georgia, and Kentucky.

19

66.



### 8.    Koch

67.    Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.

68.    Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

69.    Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

70.    Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

71.    Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the Defendants that submitted false and

artificially inflated price quotes to the GDA. Its vice-president of sales served on the Georgia Dock Advisory Committee. Koch is a Georgia Dock Defendant.

### 9. Mar-Jac

72.     Defendant Mar-Jac Poultry, Inc. is a Delaware corporation headquartered in Gainesville, Georgia. Defendant Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. Defendant Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Defendant Mar-Jac Poultry MS LLC is a Mississippi limited liability company located in Hattiesburg, Mississippi. Defendant Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. Defendant Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry" or "Mar-Jac." Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Committee. Mar-Jac is a Georgia Dock Defendant. During the relevant period, Mar-Jac sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 10. Mountaire

73.     Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

74.     Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

75.     Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

76.     Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint. Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

### 11.     O.K. Foods

77.     Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

78.     O.K. Farms, Inc., is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

79.     O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

80.     Defendants O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., and their predecessors, subsidiaries, and affiliates, including Albertville Quality Foods, are collectively referred to as "O.K. Foods." In this Complaint, O.K. Foods are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco, which reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

### 12.     Perdue

81. Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

82. Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

83. Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint. Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.

### 13. Pilgrim's Pride

84. Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado. Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Committee. Pilgrim's Pride is a Georgia Dock Defendant.

85. Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.

### 14. Sanderson

86. Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

87.     Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

88.     Defendant Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

89.     Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

90.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Sanderson Farms is a Georgia Dock Defendant.

### 15.     Simmons

91.     Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods, Inc. reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

92.     Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly owned subsidiary of

Simmons Foods, Inc. During the Class Period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

### 16. Tyson

93. Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

94. Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

95. Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

96. Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

97. Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint. Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the Defendants that submitted false and artificially inflated price quotes to the GDA.

One of its plant managers served on the Georgia Dock Advisory Committee. Tyson is a Georgia Dock Defendant.

### 17. Wayne

98.     Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Committee. Wayne Farms is a Georgia Dock Defendant.

99.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the relevant period. To the extent the term "Producer Defendants" is used herein, it refers to all Defendants other than Agri Stats.

100.    To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy

alleged herein, and their conduct in selling, pricing, distributing, and collecting monies from Plaintiff for broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint. For the avoidance of doubt, several previously unnamed subsidiaries for Defendants are specifically identified as coconspirators below.

## III. PRODUCER CO-CONSPIRATORS

### A. Producer Co-Conspirator Allen Harim

101. Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the relevant period, Harim USA Ltd. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

102. Allen Harim Foods, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland, and North Carolina. Allen Harim Foods, LLC is a wholly owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

103. Allen Harim Farms, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland, and North Carolina. Allen Harim Farms, LLC is a wholly owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

104.    Producer co-conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim" in this Complaint.

105.    All of the Defendants' and/or co-conspirators' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' or co-conspirators' various officers, agents, employees, or other representatives within the course and scope of their duties and employment, or with Defendants' or co-conspirators' actual, apparent or ostensible authority. Defendants and co-conspirators' used the instrumentalities of interstate commerce to facilitate the conspiracy, and their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

### B.    Producer Co-Conspirator Amick

106.    Amick Farms, LLC ("Amick Farms") is a limited-liability company organized in Delaware with its headquarters located in Batesburg-Leesville, South Carolina. Amick Farms is a producer of fresh and frozen chicken products and operates facilities in South Carolina, Maryland, and Delaware.

107.    Amick Farms is a wholly owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its headquarters in Aurora, Illinois.

108.    During the relevant period, Amick Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

109.    Amick Farms reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.

### C.    Producer Co-Conspirator Fieldale

110.    Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Committee. During the relevant period, Fieldale sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### D.    Producer Co-Conspirator George's

111.    George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

112.    George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. It is a wholly owned subsidiary of George's, Inc. George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint. George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas. During the relevant period, George's sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

113.    George's Chicken, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc. During the relevant period, George's Chicken, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

114.    George's Family Farms, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia and is a wholly owned subsidiary of George's, Inc. During the

relevant period, George's Family Farms, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

115.    George's Foods, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc. During the relevant period, George's Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

116.    George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc. During the relevant period, George's of Missouri, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

117.    George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc. During the relevant period, George's Processing, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### E.    Producer Co-Conspirator Marshall Durbin

118.    Marshall Durbin Companies and Marshall Durbin Food Corporation ("Marshall Durbin") was a poultry company headquartered in Birmingham, Alabama. Its assets included poultry processing plants in Hattiesburg, Mississippi, and Jasper, Alabama; feed mills in Haleyville, Alabama, and Waynesboro, Mississippi; hatcheries in Moulton, Alabama, and Waynesboro, Mississippi; a laboratory in Jackson, Mississippi; and a distribution center in Tarrant, Alabama.

119.    On January 24, 2014, Defendant Mar-Jac Poultry Inc. ("Mar-Jac") announced that it had acquired the assets of Marshall-Durbin. Mar-Jac stated that its management team "expects a smooth transition with no disruption of operations." During the Conspiracy Period, Marshall

Durbin, its predecessors, subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States

### F.     Producer Co-Conspirator Peco

120.    Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

121.    Peco Farms of Mississippi, LLC is a Mississippi limited-liability company with its headquarters in Jackson, Mississippi and is a wholly owned subsidiary of Peco Foods, Inc. During the relevant period, Peco Farms of Mississippi, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

122.    Allen Harim, Amick, Fieldale, George's, Marshall Durbin, and Peco are collectively referred to as the "Producer Co-Conspirators."

### G.     The Defendant Family Co-Conspirators

123.    Various subsidiaries and related entities of the Defendant families named herein actively participated in the conspiracy/conspiracies described in this Complaint and therefore are co-conspirators, including the following:

#### 1.     Koch

124.    JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Industries, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

125.    JCG Properties, L.L.C. is an Illinois limited-liability company with its headquarters in Chicago, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant

period, JCG Properties, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

126. JCG Land Holdings, LLC is an Illinois limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Land Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

127. JCG Foods LLC is a Delaware limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

128. Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited-liability company with its headquarters in Cumming, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cumming LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

129. Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited-liability company with its headquarters in Gainesville, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gainesville LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

130. JCG Farms of Georgia LLC is a Georgia limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During

the relevant period, JCG Farms of Georgia LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

131.     Koch Foods of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

132.     Koch Farms of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

133.     Koch Freezers LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Freezers LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

134.     Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and was a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Properties of Mississippi LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

135.     Koch Foods of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Alabama LLC sold broilers in interstate commerce,

directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

136.    Koch Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

137.    JCG Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

138.    Koch Foods of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

139.    Koch Farms of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

140.    Koch Farms of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.

During the relevant period, Koch Farms of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

141.     Koch Foods of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

142.     Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited-liability company with its headquarters in Fairfield, Ohio, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cincinnati LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

143.     Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited-liability company with its headquarters in Chattanooga, Tennessee, and is a wholly owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

144.     Koch Farms, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Conspiracy Period, Koch Farms, LLC sold Broilers in interstate commerce, directly or indirectly through its wholly-owned or controlled affiliates, to purchasers in the United States.

145.     Koch Farms of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

146.     Koch Foods of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

147.     Koch Foods of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

148.     Koch Farms of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 2.     Tyson

149.     Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc. During the

relevant period, Tyson Sales and Distribution, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 3. Perdue

150. Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Foods, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

151. Harvestland Holdings, LLC was a Maryland limited-liability company with its headquarters in Salisbury, Maryland, and a wholly owned subsidiary of Perdue Farms Inc. During the relevant period, Harvestland Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

152. Perdue Food Products, Inc. was a Maryland limited-liability company with its headquarters in Salisbury, Maryland, and a wholly owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Food Products, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

153. Perdue Farms, LLC is a Maryland limited liability company with its headquarters in Salisbury, Maryland and is wholly-owned subsidiary of Perdue Farms, Inc. During the relevant time period, Perdue Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

154. Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited-liability company with its headquarters in Salisbury, Maryland, and a wholly owned subsidiary of Defendant Perdue Farms Inc. During the relevant period, Perdue Farms Incorporated sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 4.      Wayne Farms

155.    WFSP Foods, LLC is a Georgia limited-liability company with its headquarters in Decatur, Alabama, and is a wholly owned subsidiary of Defendant Wayne Farms. During the relevant period, WFSP Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 5.      Pilgrim's Pride

156.    PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PFS Distribution Company sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

157.    Merit Provisions, LLC is a Texas limited-liability company with its headquarters in Dallas, Texas and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Merit Provisions, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

158.    GC Properties, LLC is a Georgia limited-liability company with its headquarters in Powder Springs, Georgia and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, GC Properties, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

159.    Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride of Nevada, Inc. sold broilers in interstate commerce,

directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

160. PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PPC Marketing, Ltd. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

161. Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride Corporation of West Virginia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 6. Foster Farms

162. Foster International Trading Company, Inc. is a corporation affiliated with Foster Farms, LLC and/or Foster Poultry Farms. During the Conspiracy Period, Foster International Trading Company, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

163. Napoleon Poultry Supply LLC is a Delaware limited-liability company with its headquarters in Livingston, California and is a wholly owned subsidiary of Defendant Foster Farms, LLC. During the relevant period, Napoleon Poultry Supply LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 7. O.K. Foods

164. O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly owned subsidiary

of Defendant O.K. Foods, Inc. During the relevant period, O.K. Broiler Farms Limited Partnership sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 8. House of Raeford

165. House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Shreveport, Louisiana and is a wholly owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, House of Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

166. Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Johnson Breeders, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

167. Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms of Georgia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

168. Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Arcadia, Louisiana and is a wholly owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

169. Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 9. Keystone Foods

170. Keystone Foods Corporation was (now consolidated) a subsidiary of Keystone Foods, LLC and Marfrig Alimentos, S.A., a Brazilian company. During the relevant time period, Keystone Foods Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## IV. NON-PRODUCER CO-CONSPIRATORS TIP TOP POULTRY, INC., SOUTHERN HENS, INC., AND RABOBANK

171. Non-Producer Co-Conspirator Tip Top Poultry, Inc, ("Tip Top") is a Georgia corporation headquartered in Marietta, Georgia and with facilities in other states, including Oklahoma. As alleged below, Tip Top played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.

172. Non-Producer Co-Conspirator Southern Hens, Inc. ("Southern Hens") is a Mississippi corporation headquartered in Moselle, Mississippi. As alleged below, Southern Hens played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.

173. Non-Producer Co-Conspirators Utrecht-America Holdings, Inc., a New York corporation headquartered in New York City, a commercial bank and financial services provider

41

and the American subsidiary of the Dutch cooperative banks Cooperative Rabobank U.A. and Rabobank International Holding, B.V., and three of Utrecht-America Holdings, Inc's subsidiaries – Rabobank USA Financial Corporation and Utrecht-America Finance Co. (a lender and financial-services company, respectively, both headquartered in New York City) and Rabo AgriFinance LLC (an agribusiness lender headquartered in Chesterfield, Missouri) – are collectively referred to in this Consolidated Complaint as "Rabobank." As alleged below, Rabobank played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.

174. Various other persons, firms, and corporations not named as Defendants have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as Defendants in this Complaint. Throughout this Complaint, the Producer Co-Conspirators, the Defendant family co-conspirators, and the Non-Producer Co-Conspirators identified above, and the other persons, firms, and corporations not named as Defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

175. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

176. Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

177. The Defendants named in each underlying DAP complaint are jointly and severally liable for the acts of all Defendants and Co-Conspirators named in that DAP complaint.

## V.     JURISDICTION AND VENUE

178.    The Court has subject-matter jurisdiction of the various federal claims under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15, 26.

179.    Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District. In addition, Defendants have already submitted to the jurisdiction and venue of this Court.

180.    Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

181.    This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

182.    This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark. The alleged scheme and conspiracy have been directed at, and had the intended effect

of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

## VI.    TRADE AND COMMERCE

183.    According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of defendant Pilgrim's Pride recently commented that "the chicken business *per se* is a commodity business."

184.    The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.

185.    Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes, such as product quality or customer service.

186.    Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

187.    Due to the lack of product differentiation, Defendants compete on price (absent collusion) such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry makes it attractive to implement a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.

188.    The United States chicken market is a national market, valued at nearly $41 billion in 2016. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers

produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

189.    During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States.

190.    The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing/feeding, slaughtering mature birds, processing, and selling.

191.    At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

192.    The prices for chicken purchases during the relevant period were based in part on prices published by one of three entities: Urner Barry, the Georgia Department of Agriculture (the "Georgia Dock"), and the United States Department of Agriculture (the "USDA Composite").

193.    The Georgia Dock, USDA Composite, and Urner Barry indices all measure the same (or very similar) size and grade of chicken.

194.    The USDA's publicly available Composite index collects and publishes chicken price information on a weekly basis.

195.    Urner Barry collects and publishes daily price information for chicken. This information is subscription-based, and all chicken producers and many chicken purchasers subscribe for a fee.

196.    The USDA and Urner Barry chicken price indices are purportedly based upon a system of double verification, which includes telephonic and written surveys of all or nearly all

45

chicken producers. The Georgia Dock index was based on a materially different methodology discussed in more detail below.

197.     Published chicken prices from Urner Barry, Georgia Dock, and USDA relate to the spot market for chicken (a spot market purchase is a non-recurring purchase for immediate delivery). Defendants also used the prices for chicken on the spot market, especially as reported by Georgia Dock, to negotiate prices for their contract purchasers.

198.     As a consequence of the inelasticity of supply and demand in the chicken industry and the availability of the spot market price indices, public price announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase chicken spot market prices or maintain them at artificially inflated non-competitive levels, and therefore that all chicken prices would increase or be artificially high.

199.     During the relevant period, Defendants produced, sold, and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conduct of the Defendants as alleged herein, including the conspiracy in which Defendants participated, was intended to have and had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in this District.

200.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

201.     During the time period relevant to Plaintiffs' claims, Plaintiffs and/or their assignors, directly purchased chicken in the United States from one or more Defendants and/or their Co-Conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Plaintiffs are "persons" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VII. FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY

202.    Defendants used multiple means to sustain the conspiracy/conspiracies described in this Complaint. Defendants engaged in a series of supply reductions at the start of the distribution chain. Defendants coordinated their strategy for achieving their desired anti-competitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of broilers. As part of this strategy, Defendants exchanged information regarding anticipated future production through Agri Stats. Defendants also manipulated the Georgia Dock price index. In furtherance of their conspiracy, Defendants also conspired to submit artificially high bids to purchasers in an effort to drive up prices, and in turn, Defendants' profits. And Defendants engaged in pricing communications targeting specific customers.

203.    In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering.

204.    In 2007, a glut of chicken—the result of significant overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford—began to flood the market, and prices cratered.

205.    In 2007, Pilgrim's, Tyson, and a few other chicken producers (Foster, Peco, and Perdue) attempted to cut their production levels enough to cause industry prices to rise.

206.    However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other broiler companies increased their production.

207.    Production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production—such as slaughtering chickens early. Defendants did not, however, make

significant cuts at the top of the supply chain—such as by culling of breeder flocks—which would have had longer-term effects on supply.

208.    By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants—individually and collectively—in dire financial straits. In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry. As a result, Defendants agreed to depart from the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.

209.    Instead, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, through communications both direct and facilitated by third parties, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began implementing the conspiracy. Among other acts in furtherance of the conspiracy, Defendants called on one another to heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and that increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

210.    Defendants collectively agreed to the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective—as a mechanism to increase Defendants' profits.

211.    Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct. As alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that signaled deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.

212.    Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this not-easily-reversed production reduction effort.

213.    While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's—which, as publicly held entities holding sizable but by no means controlling) shares of the U.S. chicken market, were well-positioned to rally the entire industry—Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly held Defendants.

214.    For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO, Lampkin Butts) a panelist at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[3]

### A.    Production Cutting

### 1.    In an Early Phase of their Conspiracy, Defendants Departed from Their Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts

215.    In 2008, and throughout the relevant period, the vertically integrated Defendants had the ability to manipulate supply to the chicken market at one or more stages of the supply chain.

---

[3] Excerpts of comments made by Messrs. Welch and Butts are publicly available on WATT PoultryUSA's YouTube channel. See "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v=ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s. (both last visited July 23, 2020).

216.    Beginning in early 2008, Defendants began utilizing this ability by making significant production cuts, including unprecedented cuts in their breeder flocks.

217.    Defendants knew they could effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.

218.    By design, reducing breeder flocks would have significant, and long-lasting, effect on supply of chickens in the market—more so than reducing supply down the chain.

219.    Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time—anywhere from six to eighteen months or more—to re-populate a breeder flock that has been reduced through early culling.

220.    While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions that could not be easily reversed by Defendants.

221.    Defendants' calculated decisions to create long-term reductions are clear indicators of a collusive agreement because it would not be in an individual Defendant's economic self-interest to undertake the significant risk of reducing its own long-term production capacity unless it was known that competitors would undertake similar dramatic and long-term cuts to production capacity.

222.    Defendants' collective output-restriction caused a significant, not-easily-reversed, slowing in overall chicken production during the conspiracy—bucking the historic trend of steady annual production increases.

223. The overall effect of this mechanism of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[4] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), it then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year)—a significant decrease in the pace, timing and manner of chicken production during the relevant period:



2. **Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary**

---

[4] [2] NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen—Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB-89780E3D1620 (last visited July 23, 2020).

224. On January 23-25, 2008, numerous employees of Defendants, including many of Defendants' senior executives, attended the International Poultry Expo conference in Atlanta.

225. According to the trade association organizing the annual multi-day event, attendees represented companies responsible for over 99.4% of the production of chicken.

226. On a January 28, 2008 earnings call, Tyson CEO Richard Bond—who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently . . . got our first series of data"—stated that "we have no choice [but] to raise prices substantially."

227. However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.

228. Mr. Bond's comment therefore made no economic sense absent an intention or knowledge on his part that Defendants would coordinate an industry-wide reduction in supply that could not be easily reversed.

229. The day after Tyson's statements confirming its renewed participation in Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.

230. On a January 29, 2008 earnings call, Pilgrim's CFO Rick Cogdill communicated that the industry's oversupply of chickens was hurting market prices.

231. Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

232.     Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.

233.     Mr. Cogdill noted that "we have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids . . . So we are trying to take a leadership position from a pricing perspective."

234.     He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply: "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that … [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

235.     When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen…. And if the industry doesn't react soon enough it will have to react stronger in the end."

236.     Cogdill also responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there…. It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that…. I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

237.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would act in concert to cut production.

238.    Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production."

239.    Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable," and "if it's bad and ugly and deep in February, March, April, you'll see the production cuts take place during that period of time." He added, "[t]here's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

 Defendants also communicated privately.

### B.    Defendants Begin to Cut Production in Concert

241.    Around March 4, 2008, senior executives from Defendants, including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, Case Foods CEO Tom Shelton, Amick President and CEO Ben Harrison, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

242.    Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, and it proceeded with production cuts.

243.    On March 12, 2008, Pilgrim's CEO Clint Rivers publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions

… are absolutely necessary to help bring supply and demand into better balance…. That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that <u>this industry</u> can continue to supply." (emphasis added.)

244.    Under competitive conditions, other chicken producers would typically respond to Pilgrim's substantial supply cuts by increasing their production. Yet just the opposite occurred.

245.    Following the Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008:

246.    On April 3, 2008, Fieldale Farms announced a 5% production cut, stating that "We're hoping this cut puts supply and demand back into better balance."

247.    Fieldale Farms is not a publicly traded company, and there was no reason—other than signaling to its fellow producers that it was following through on its conspiratorial agreement—why it would publicly disclose its production plans.

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████

249.    On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.

250.    Simmons is not a publicly traded company, and there was no reason—other than signaling to its fellow producers that it was following through on its conspiratorial agreement— why it would publicly disclose its production plans.

251.    On April 10, 2008, Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

252.    On April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

253.    Neither Wayne, nor O.K. Foods, nor Koch is publicly-traded, and there was no reason—other than signaling to their fellow producers that they were following through on their conspiratorial agreements—why they would publicly disclose their production plans.

254.    Several other chicken producers cut their production between April 1, 2008 and May 15, 2008 but did not publicly announce the cuts.

255.    Because of Agri Stats, there was no need to make a public announcement.

256.    For example, at the BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated—in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond—that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. ***I know some companies have cut back and have not announced***." (emphasis added).

257.    Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.

258.    After seeing many of its competitors abide by capacity reductions between April 3-11, on April 11, 2008, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply and decided it could now take further steps to reduce supply.

259.    On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

260.    Then, on April 14, 2008, it announced a further production cut of 5% of egg sets.

261.    On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed … I don't think the industry will be up [in production] that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

262.    Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's CEO, Clint Rivers, encouraged further action by other chicken producers to curtail supply.

263.    Clint Rivers encouraged further industry-wide cuts at a May 15, 2008 speech at the BMO Capital Markets conference at the Millennium Broadway Hotel. According to an industry publication, Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

264.    This conference was attended by Tyson CEO Richard Bond, and it is the same conference where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public,

unannounced production cuts by competitors. The conference was also attended by Pilgrim's CFO Richard Cogdill.

265.    A June 2008 Agri-Stats report noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

266.    A May 21, 2008, *Wall Street Journal* article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."

267.    The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August—still the peak of the high-demand summer grilling season.

268.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. Sanderson responded: "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New

Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past. The reason was obvious— to signal the other Defendants to follow suit. In early June 2008, Pilgrim's CEO Clint Rivers noted in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply … we need to see some balance in the supply…. Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

269.    Other Defendant CEOs soon picked up on Rivers' call for further action. On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate, a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year" and that "we are hearing talk that this was not nearly enough, so liquidation is in round two." This statement referred to the need for Defendants to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight.

270.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Wayne Farms

President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.

271.    On June 23-25, 2008, the industry organization USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

272.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.

273.    In a statement, Foster Farms CEO, Don Jackson, noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

274.    Mr. Jackson's purported justifications for decreasing production capabilities were pretextual.

275.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

276.    O.K. Foods' purported justifications for decreasing production were pretextual.

277.    On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a

marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

278.   On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."

279.   The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.

280.   Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

281.   In August 2008, Raeford (a non-public company) announced publicly, as reported by newspaper *The Charlotte Observer*, that it would begin reducing its chicken production by 5 percent. The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand."

282.   A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

283.   On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made

enough production cuts, he noted "we kind of thought we were going to see reductions in July ... [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works…. I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

284.    By September 2008, chicken industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

285.    On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO, Blair Snyder—elected the day before as a "director-at-large" to the National Chicken Council's board—moderated a CEO panel that included the CEOs of Pilgrim's, Tyson, Perdue and Sanderson Farms. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

286.    On October 10, 2008, in response to a USDA report of falling egg sets in the chicken industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

287.     Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

288.     During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

289.     On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.

290.     Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

291.     On a November 10, 2008 earnings call, Tyson CEO Richard Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand."

292.     Despite Tyson's representations to the contrary, Tyson, in fact, substantially reduced production in December 2008.

293.     First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.

294.     Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.

295.     Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our

supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

█████ During this time period, Defendants also utilized Urner Barry as a conduit for the sharing of information and ensuring compliance with the production cuts. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

297.    As further detailed below, these numerous collusive communications between O'Shaughnessy at Urner Barry and the Defendants furthered the conspiracy to limit output and resulted in higher prices than would have existed in the absence of such efforts. And prices reflected in the indexes published by Urner Barry itself were also therefore necessarily inflated as a result of the conspiracy. Both O'Shaughnessy and the Defendants knew that these inflated prices were the logical—and intended—result of their efforts to further the output limitation conspiracy.

298.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

299.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices … the industry fundamentals are improving."

300.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.

64

301.     According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action.

302.     Tyson communicated that it felt it had already perilously led the industry on production cuts and was confident that competitors would support through significant cuts of their own. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce production during the 2008-2015 time period in line with other producers.

303.     By February 25, 2009, Sanderson Farms told *The Morning News* of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

304.     Similarly, the CEO of Simmons Foods (a private company), Todd Simmons, noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

305.     Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009.

306.    In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

307.    Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).

308.    Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

309.    During 2009, Defendants also exchanged and agreed upon specific prices to charge common customers.

**C.    Defendants' First Round of Chicken Production Cuts Included Unprecedented Reductions to Chicken Breeder Flocks**

310.    As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.

311.    What made the production cuts in 2008 and early 2009 particularly remarkable is that chicken producers did not just reduce the pounds of chickens they produced—they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.

312.   While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks in ways that were not easily reversed and would result in a commitment to longer-term reductions, as shown in the highlighted section of the graph below:



313.   The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear. During the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.

314.   For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

315.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008." Pullet placement data was collected from Defendants and their Co-Conspirators by Agri Stats, and sent monthly in reports to Agri Stats subscribers, and used by the chicken industry to monitor and control future supply.

316.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.

317.    Defendants also continued to utilize Mr. O'Shaughnessy of Urner Barry to communicate the plan to limit production. ██████████████████████████████████████ ████████████████████████████████████████

318.    In another example, at the National Chicken Council's October 2009 Annual Conference ███████████████████████████████████████████████ ██████████████████████████████████ one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

319.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades.

320.    Because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.

321.    The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.

322.    Defendants faced an incentive to revamp their conspiracy to make it more effective. Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of production cuts in the first half of 2011. Those cuts caused prices to recover.

**D.    Defendants Continued Their Conspiracy With A Second Massive Breeder Flock Cull in 2011**

323.    As before, Defendants communicated their efforts through Mr. O'Shaughnessy of Urner Barry. ███████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

324.    On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen'…. The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks,

rationalization, and consolidation…. The market is calling for around a 5% reduction in chicken production."

325.    On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

326.    On a February 16, 2011, Cagle's (acquired by Koch) earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

327.    On or around February 25, 2011, Sanderson Farms CEO, Joe Sanderson, announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina broiler complex.

328.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions…. Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

330.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

331.    On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

333.    On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply. The only way to less supply is *chicken companies will shut down or cut back*…. I think that's what we're going to see" (emphasis added.)

334.    Downes' view of the state of the chicken industry was echoed, and amplified, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry—forget Sanderson—the industry cannot sustain losses like they are sustaining for a long period of time. They will—they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance

sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Sanderson continued, "***my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats***" (emphasis added).

335.    Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).

336.    The conference included a presentation by Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," i.e., breeder flocks, to better balance supply and customer demand.



339.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's—a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy—said that "***the industry must lower supply*** in order to offset reduced demand and to support higher market prices." (emphasis added.).

340. Other Defendants and Co-Conspirators, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

341. Keystone Foods, like many of the Defendants, relied on Urner Barry as a conduit for information regarding the supply reduction aspect of the Defendants' conspiracy. ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Numerous communications such as these show how Defendants used Urner Barry to facilitate the flow of communication among them regarding production cuts.

342. Keystone Foods also utilized Urner Barry as a conduit for sharing information regarding current broiler pricing and plant operations by other Defendants. ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████

343. In approximately June 2011, Tyson pulled eggs from its incubators to reduce Broiler volumes.

344.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

347.    On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken…. A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

348.    On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson

also stated that it "***wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November***.... Nobody knows what cuts might be needed until we get to October, ***but I think that the cutbacks may need to be more than the 6% in head that the industry has in place***" (emphasis added).

349.    A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before ***industry economics can improve***. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter.... Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market" (emphasis added).



351.    On August 18, 2011, Cagle's, now a subsidiary of Koch Foods, announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

354.    In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry. The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and

Supply Chain, after having been Pilgrim's CEO), Keystone (William Andersen, Senior Vice President) and Koch Foods (Mark Kaminsky, COO and CFO). Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and ***companies are going to need to adjust***. Discipline on the supply side was one suggestion. Getting better prices from retailers was another" (emphasis added).



357.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

358.    On a November 21, 2011, earnings call, Sanderson Farms CEO, Joe Sanderson, responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

[REDACTED]

360.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.

361.    In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.

362.    On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

363.    In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

364.    At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks. The kind of early slaughter of breeder flocks— including, for example, the bird-age data included in the "Growth Rate Report" described above— meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

365.    The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.

366.    Entitled "The U.S. Chicken Industry: Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> "U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago."

367.    The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "***the recent cuts in the hatchery flock will prevent a quick response***," with "U.S. chicken production [...] on track to fall to its lowest level in 5 years by mid-2012" (emphasis added).

79

368.    The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



369.    The sentiment of CoBank's March 2012 report was echoed by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that ***the industry is going to remain constrained***" (emphasis added).

370.    Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012; Urner Barry's annual marketing seminar, from April 29 - May 1, 2012; the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.



373.    On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

374.    By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for purchasers.

375.    The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

376.    On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C.

377.    Among Defendants' senior executives attending the meeting were the President of Fieldale Farms (Thomas Hensley) and CEO of O.K. Foods (Paul Fox).

378.    Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and ***how will the industry apply those lessons in 2012 and 2013***" (emphasis added).

379.    Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014, including, for example: (▮

**E. Drastically-Reduced Breeder Flocks Boosted Chicken Prices And Raised Defendants' Profits to Record Levels**

380. For most of the remainder of 2012 through at least 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.

381. During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline."

382. For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, touted the chicken industry's collective discipline:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained…. So I think *the industry is doing an admirable job in being disciplined on the supply side* and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying…. I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs. I think I'm confident to say, *we've figured that out and we're doing a good job* of balancing supply and demand. (emphasis added.)

383. On the May 3, 2013 investor call, Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

I only know what we've seen happen in the past. Now, certainly, this summer *if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk*…. I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and *we've done a good job so far of maintaining discipline* such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry. (emphasis added).

On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years."

385.    Defendants had reason to be positive. For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings. Lovette noted that "I think the one thing that creates … has created the stability is *the discipline of the industry to not allow profitability in the past to drive supplies in the future*…. And I think that discipline really … is the one ingredient that has made for more stable earnings that we have seen." (emphasis added.)

386.    At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

388.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014. According to the report:

> [P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

389.    The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

390.    Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014.



391.    On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are broiler breeders that have reached the end of their

productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced broiler breeder capacity resulting from Defendants' initiatives to cut broiler breeder capacity across the industry.

392. During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."



394. The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.

395.    WATT PoultryUSA's March 2016 issue noted, for example, that Tyson had achieved "record earnings and sales in fiscal year 2015 ... posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth."

396.    The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

397.    This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs.

398.    Defendants proactively maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction.

399.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

400.    Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards profitability rather than just market share* or field growth." (emphasis added.)

401.    Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.

402.    Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction dimension of their conspiracy by keeping breeder flocks low.

403.    For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

> ***[T]he industry continues to be disciplined in terms of U.S. supply.*** Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because ***chicken producers are being disciplined*** and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (emphasis added.)

404.    Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.

405.    Defendants again utilized Mr. O'Shaughnessy of Urner Barry to communicate the capacity at which their plants were running. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

406.    During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred.

Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?…. Since back in 2007 … there are three or four plants shuttered.… It does feel different."

407. On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [sic] set in 2007 … egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."

408. Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

409. On the July 28, 2016 call, Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the *discipline* that we continue to see exhibited by the entire industry," which "***gives us more confidence that we're going to do the right thing with respect to maintaining that discipline*** … and … gives us confidence that we're going to continue to be disciplined as an industry." (emphasis added.)

410. On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith—who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016—stated that "our chicken business is ... it continues to do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great ... all that business is very profitable to us."

**F.** **Defendants utilized Urner Barry to assist them capitalize on their supply reduction efforts**

411.  Although Urner Barry prices are intended to be based on a system of double verification, which includes telephonic and written surveys of all or nearly all broiler producers, along with verification of reported prices from broiler purchasers such as brokers and customers, Defendants understood and took advantage of its susceptibility to manipulation.

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████With knowledge of Mike O'Shaughnessy's susceptibility to influence, and his control over Urner Barry's prices, Defendants routinely, consistently, and collectively pressured Urner Barry to raise prices. ████████████████████████████████

████████████████████████████████████████████

███████████████████

███████Defendants conspired together to pressure Urner Barry to raise prices. ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

89



421. Mike O'Shaughnessy actively and openly discussed broiler production with Defendants, to which Defendants used Urner Barry to facilitate communications among themselves.





431.     Defendants improperly kept Urner Barry prices from falling when they should have.

432.     And when Urner Barry prices increased, Defendants linked the price increase to their actions.

433.     While Defendants were not as successful at eradicating price volatility in Urner Barry as they were the Georgia Dock—they did not have sole control over price inputs with Urner Barry—their collective actions increased prices across all indices.

434.     Indisputably, Defendants actions were interrelated. Rising prices and price quotes inflated by coordinated pressure benefited each of the Defendants across each index, leading to higher broiler prices for purchasers.

435.     And individual pressure was not always possible, as Urner Barry took into account numerous sales numbers and quotes collectively from multiple Defendants. In those instances, collective action was required.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

### G. Defendants Capitalized on Their Prior Actual Reduction of Broilers to Coordinate a False Supply Reduction

437. Defendants also were able to take advantage of their coordinated reduction in the supply of broilers in price negotiations with restaurants and other contract purchasers. This was especially the case with Small Birds.[5]

438. For example, as part of their collective goal to increase the prices of broilers, Defendants coordinated inflated prices to restaurants and other contract purchasers in the time period beginning at least as early as 2012 and continuing through at least 2017. One of the primary explanations Defendants presented for these inflated prices was what they said was a reduction in the supply of broilers. Defendants were able to point to the actual supply reduction that they orchestrated for broilers in the 2011-2012 timeframe. Yet, at the same time, the number of Small Birds killed increased significantly in the 2011-2013 period and remained elevated throughout the remainder of the relevant period.

439. Defendants also used their coordinated false explanation of supply reduction for their elevated prices of broilers even for those restaurants that did not purchase Small Birds. Through these coordinated misrepresentations, Defendants were able to persuade restaurant chains and other purchasers to accept higher prices for broiler products.

---

[5] Small Birds are generally defined as Broilers weighing 4.25 pounds or less. Upon information and belief, Sanderson Farms, Foster Farms, Harrison Poultry, and Peco Foods did not produce Small Birds during the alleged bid rigging conduct period, and House of Raeford Farms, Inc. has not produced Small Birds since mid-2012, the beginning of the bid-rigging conduct period.

**H.  The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the Georgia Dock Price Index**

440.  Defendants buttressed their successful efforts to artificially boost chicken prices by collectively reducing supply by collusively and fraudulently manipulating the Georgia Dock benchmark price index, a chicken-industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers. The Georgia Dock was such an important index that, even when purchasers' contracts were not explicitly indexed to the Georgia Dock, the prices paid by purchasers were materially affected by the Georgia Dock price.  As such, the manipulation of the Georgia Dock did not only have an anticompetitive effect on the price for sales of broilers that were quoted based directly and expressly on the Georgia Dock; rather, it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock. This contamination occurred because Defendants often used the Georgia Dock as a crosscheck or a baseline for transactions even where the Georgia Dock was not the primary benchmark that suppliers used to provide quotes to customers. For example, Defendant Keystone Foods utilized Georgia Dock as a reference point across the board for pricing even when their agreements with, or quotes to, customers did not call for the price to be based on the Georgia Dock.

441.  During the relevant period, broiler chicken prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture through the Georgia Dock, and the USDA. Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").

442.  Urner Barry collects and publishes daily price information for broilers. Urner Barry's chicken price information is subscription-based, so all producers and many purchasers subscribe for a fee. The USDA and Urner Barry's broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken

94

producers, but also verification of reported prices from purchasers such as brokers and customers. The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below.

443. The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[6] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from broiler companies.

444. Published prices for broilers from Urner Barry, Georgia Dock, and USDA relate to the market for broilers. Prices for chicken, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.

445. Statements by chicken company executives and industry experts confirm that chicken sales, whether by contract or on the spot market, are tied to spot market pricing. For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry." Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're

---

[6] Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

not sold spot, are tied to the spot prices…. 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's broiler sales were tied to broiler spot market prices such as Georgia Dock.

446.    As a consequence of the inelasticity of supply and demand in the broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase broiler spot market prices, and therefore that all broiler prices would increase.

447.    The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[7]

448.    The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks, and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

449.    Buyers reasonably relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought, especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was meant to reflect the market price of chicken. Many purchasers purchased chicken from

---

[7]    Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs.  At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

Defendants at prices that used the Georgia Dock as a component throughout the relevant period. In some instances, Defendants insisted upon using the Georgia Dock in their pricing with purchasers and/or declined to use another form of pricing with purchasers.

450.    Much like when the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

451.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants. The Georgia Dock Defendants are the nine producers that submitted price quotes that went into the Georgia Dock price index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (approximately 35% of Georgia market share in 2016); Tyson (15%); non-Defendant Fieldale (15%); Mar-Jac (10%); Claxton (10%); Sanderson Farms (7%); Harrison (5%); and Koch and Wayne Farms (less than 2% each).

452.    The significant difference between the Georgia Dock price index and other broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high broiler prices to the GDA. That is because of the GDA's "one cent rule," as discussed in more detail below. Under this rule, prices that deviate by more than one cent from the average price as initially calculated are excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from the prices in the other indices—indices that are themselves based on verified sales by Defendants—can be attributed only to all or nearly all participating broiler producers collectively submitting artificially high and identical or very nearly

identical broiler prices to the GDA. In other words, all or most of the Defendants' submissions needed to be roughly within two cents of each other in order to inflate the Georgia Dock price and maintain an artificially inflated Georgia Dock price over time—a price which, for extended periods of time, was 20 or 30 cents higher than the comparable (and also inflated, due to the anticompetitive conspiracy alleged herein) Urner Barry price index. Notably, the Georgia Dock was also higher than the USDA and EMI indices.

453.    To compile the Georgia Dock price index, according to an internal GDA document provided to the *New York Times* through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each broiler producer company and it is accepted without any verification of actual invoices or any other form of auditing to verify accuracy. In response to a press inquiry, the GDA explained its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

454.    Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum, disclosed publicly for the first time on November 17, 2016, in a *Washington Post* article, Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided."

455. Schronce's memorandum confirms the significance of the one cent rule; it noted that after a January 2016 article about the Georgia Dock price index in the *Wall Street Journal*, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."

456. Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers whose transactions with Defendants were tied to the Georgia Dock whole-bird price, reasonably but mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers erroneously believed the Georgia Dock price to be a USDA price.

457. Purchasers were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual offering prices for the next week as reported to the GDA. This was false; the Georgia Dock Defendants did not report their true prices to the GDA. Instead, they agreed to, and in fact did, intentionally report false, artificially high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the offering price of their chicken was now $2, the Georgia Dock price would become $2, and the prices that purchasers paid for chicken would increase commensurately.

458. Once a week, Schronce, his predecessor Greg Pilewitz, and/or their assistants at the PMN would call or email with representatives of the Georgia Dock Defendants to collect price

submissions, which were supposed to reflect those Defendants' actual offering prices. The PMN collected the Defendants' price submissions and weighted each of them by the Defendants' above-referenced relative market share (referred to by the PMN as that company's "voice").[8]

459.    In addition, many of the Defendants submitted price quotes to the PMN via email, and those emails confirm many of the specific false and inflated quotes to the PMN.

460.    All parties knew that Defendants were supposed to submit to the PMN their actual offering prices for 2.5 to 3-pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5- to 3-pound birds in Georgia, so, according to the PMN, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." The Georgia Dock Defendants knew that, if they did not sell 2 ½ to 3-pound whole birds, they had to reliably convert their offering price each week for the whole birds they sold into a 2.5 to 3-pound bird. Once the final Georgia Dock whole bird price was calculated, the PMN used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the PMN each Wednesday.

461.    In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry poultry indices, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers. In essence, from the inception of the Georgia Dock in the 1960s until late 2016, the PMN relied on the "honor system" as to the truthfulness and accuracy of the offering prices submitted by the Georgia Dock Defendants.

---

[8]    There was only one change to the weighting formula during the relevant time period.

462.    In addition, submission of prices to the PMN was entirely voluntary. There were no regulations, rules, or legislation requiring poultry producers operating in the state of Georgia to submit their prices to the PMN.

463.    Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the death of his predecessor Greg Pilewitz, first made a preliminary calculation of the weighted average using the single price submission from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

464.    Because of the GDA's one-cent rule, it was not possible for only one or two broiler companies to report a broiler price that was significantly higher than the actual market price to the GDA without being disregarded as outliers by the GDA. Accordingly, certain Georgia Dock Defendants began reporting prices to the GDA that fell within a very narrow range but were also significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilized during 2015-2016 at historic highs. It was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.

465.    Nothing was done to verify or substantiate these numbers. There was no "double-verification;" unlike with the other price indices, customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified "price quotes"

from the same set of chicken producers (the Georgia Dock Defendants) submitted each week to one or two GDA employees, a methodology that was susceptible to manipulation.

I.     The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry

466.    The Georgia Dock has been an industry tool ever since it was first created as part of the Poultry Market News Bulletin in 1965. At that time, the GDA created the first Georgia Dock based on a recommendation from the Georgia Poultry Federation (the "GPF") that the GDA begin reporting a "live quotation" (i.e., the price of a live bird). The GPF was—and continues to be—a trade association comprised of Georgia poultry producers.

467.    In 1972, the poultry producers, through trade organizations such as the GPF and the Georgia Poultry Processors Association, began to lobby the GDA to discontinue the PMN "live quotation." Instead, the joint industry group recommended that the PMN quote an F.O.B. dock equivalent price. In their recommendations, the joint industry group even set out guidelines for what the PMN should be reporting. As the Georgia Commissioner of Agriculture at that time, Tommy Irvin, stated in a February 11, 1972 letter, the joint industry group had recommended an F.O.B. dock price equivalent that represented "full truck load lots of Ice Pack, USDA Grade A, sized 2 ½ to 3 pound broilers and fryers."

468.    The GDA accepted this recommendation and, on February 22, 1972, transitioned the PMN to reporting the F.O.B. dock price equivalent that is known today as the Georgia Dock. Other than a switch to emailed (rather than telephonic) price submissions for some poultry producers, there have been no further changes to the PMN's methodology for calculating the Georgia Dock since 1972.

469.    Since the transition in 1972, the stated purpose of the Georgia Dock has always been to report an F.O.B. dock price equivalent. According to an email sent by Arty Schronce on August 2, 2016, "[o]n February 23, 1972, (Wednesday) the opening line of the report was: The Georgia F.O.B. dock price for next week's trading on full truck load lots of ice pack USDA Grade 'A' sized 2.5 to 3 pound broilers and fryers are being sold on the bases (basis) of 27 cents; 32% of the loads offered have been confirmed on the bases (basis) of 27 cents." Indeed, as recently as April 2016, the GDA website page for the Georgia Dock stated that "we report the established prices of dressed f.o.b. dock broilers and fryers."

470.    Following the 1972 transition, and in order to facilitate their control over the Georgia Dock price index, the poultry industry had another recommendation for the GDA: the creation of a non-public, non-governmental PMN Advisory Committee. As stated in the minutes from a Georgia Poultry Processors Association meeting from 1972, "[i]t was requested that the Federation recommend to the Department of Agriculture that an appointment of an Advisory Committee be made by the Commissioner to work in close relationship with the Market News Service and with the guidelines which were set forth in establishing the F.O.B. reporting system." Again, the GDA accepted this recommendation and formed an Advisory Committee comprised of representatives from the poultry producers who submitted prices to the Poultry Market News.

471.    Defendants—through their roles in creating and contributing to the Georgia Dock and serving on the Advisory Committee—had intimate knowledge of the procedures by which the PMN collected, calculated, and reported on the established prices for dressed F.O.B. dock broilers and fryers that the Georgia Dock should have been reporting. Defendants stayed apprised of this knowledge through meetings between the poultry producers and the PMN, during which they would discuss and review the reporting policies and procedures for the Georgia Dock. Defendants'

knowledge even extended to the calculation forms used internally at the PMN, which were circulated to members of the PMN Advisory Committee following one of their meetings on January 25, 2007.

████████ As is relevant to Defendants' fraudulent scheme as discussed further below, ██

███████████████████████████████████████████████

████████████

475.    Not only did Defendants have intimate knowledge of what prices should be submitted to the PMN for inclusion in the Georgia Dock, but they also maintained firm control over the Georgia Dock through the Advisory Committee. From its inception, the Advisory Committee was composed of senior executives from the Georgia Dock Defendants, and its mission was to advise the GDA on issues relating to the PMN division's collection of prices from Defendants and setting of the Georgia Dock price.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

477.    From at least September 2012 through 2016, the Advisory Committee included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

478.    The Advisory Committee therefore consisted entirely of representatives of one side of the transaction: the poultry producers. Despite the fact that the Georgia Dock affected both buyers and sellers of chicken alike, there were no representatives of buyers on the Advisory

Committee. There were also no neutral economists or members of academia. The producers, and the producers alone, controlled the PMN, often working hand-in-hand with their current or former lobbyists within the GDA and from the Georgia Poultry Federation, as discussed in more detail below.

479.    The Advisory Committee controlled the process for calculating and, as set forth in this Complaint, reevaluating the Georgia Dock price. When he was installed as director of the PMN, Arty Schronce was told that he could not make any changes to the Georgia Dock without first clearing them with the Advisory Committee.



481.    The existence of the Advisory Committee also helped to ensure that the Georgia Dock Defendants were intimately aware of the process by which the Georgia Dock price was calculated, enabling them to manipulate it. The Advisory Committee met periodically and discussed how the Georgia Dock price was calculated. In addition, because of their familiarity with the underlying guidelines and internal PMN calculations, the Georgia Dock Defendants knew the prices they submitted to the PMN were not subject to verification, and that those submissions

would be used to calculate the next Georgia Dock price unless they deviated from the initially-calculated weighted average by one cent or more. (Although it appears there was no representative of Sanderson Farms on the Advisory Committee throughout the entire relevant time period, Sanderson Farms was aware of this fact through communications with other Defendants.)

483.    The existence and conduct of the Advisory Committee was not known to chicken buyers, including until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology. He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent."

   **J.      The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

486.    The GPF also regularly acted as a go-between for the GDA and the Advisory

Committee; it would explain to Advisory Committee members the purpose of certain meetings and

remind Advisory Committee members of their companies' obligations with respect to the Georgia

Dock. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████The GPF was another means through which the Georgia Dock Defendants knew

that the Georgia Dock was supposed to represent the actual price at which Defendants would sell

F.O.B. 2.5- to 3-pound whole birds in the upcoming week. ███████████

████████████████████████████████████████

████████████████████

### K. The Georgia Dock Became Ripe for Manipulation

488. A number of factors at the beginning of the relevant time period made the Dock more vulnerable to manipulation and ultimately resulted in a marked upward departure of the Georgia Dock from all other poultry pricing indices.

489. In or around 2008 and 2009, with the GDA experiencing drastic budget cuts, Georgia Commissioner of Agriculture Tommy Irvin conducted an inquiry into the PMN Division to determine if staffing cuts or other efficiencies were warranted. At the time, the PMN was staffed by four full-time employees: division director Greg Pilewitz, Toni Leslie, Nell Moncus, and Donald Carnes. Over the next three years, the staff of the PMN Department was cut from four full-time employees down to two.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

491.    Due to budgetary constraints, Commissioner Black further reduced the staff of the PMN Department in 2011 and 2012. When Mr. Pilewitz died unexpectedly in early 2012, Ms. Leslie was left to run the PMN Department alone until a replacement could be found. In October of 2012, Arty Schronce was installed as director, but he only worked for the PMN part time. Schronce also performed other projects at GDA, including authoring a gardening column and working for the press office. Shortly after Mr. Schronce assumed the position, Ms. Leslie was replaced by Demetria Mabry. Mr. Schronce and Ms. Mabry were instructed to continue collecting the poultry producers' price submissions and calculating the Georgia Dock as it had always been calculated, but neither had the foundational knowledge to recognize the ways in which poultry producers began divorcing their price submissions from reality.

████    These factors, combined with the Georgia Dock Defendants' knowledge of the Georgia Dock pricing process, enabled them to collectively devise and then execute a simple yet elegant scheme to artificially inflate the Dock price and sustain that inflated Dock price for approximately six years. As discussed in further detail below, ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████



497.    But the possibility that any change could be made to the Georgia Dock was illusory. Despite Defendant's knowledge that they were submitting information to the Poultry Market News that was contrary to the guidelines Defendants themselves had created, the system had never changed.

**L.     Regulatory Investigation and Demise of the Georgia Dock**

498.    The PMN's Director, Arty Schronce, had concerns that the Georgia Dock was unreliable, had been captured by the chicken producers, and was being manipulated by the chicken producers. His concerns grew over time. By September 2016, he articulated concerns in a memorandum, in which he noted that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

499.    Following the January 2016 *Wall Street Journal* article, federal governmental officials began to investigate. On July 19 and 20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price. The USDA officials shared their conclusion that GDA could no longer simply accept broiler prices from Defendants without verification and instead would have to verify invoice-level data to confirm reported prices. On July 20 and 21, 2016, USDA officials requested that the GDA provide the USDA with data from broiler producers to "test and review" the Georgia Dock price for accuracy.

500.    On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR, all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.

501.    At that time, high level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review."

502.    GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and

113

reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

503.     Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." In short, the GDA had been publishing the Georgia Dock price for decades, but until this time apparently did not know the scope of reliance on the Georgia Dock price. Significantly, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

504.     On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." The Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members. Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand. Defendants

114

already report such invoice information to Agri Stats on a daily basis. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

505.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology in late 2016. After the Georgia Dock Defendants balked at the GDA's new methodology—which would have required them to verify and attest to the accuracy of their price quotes—the GDA halted the Georgia Dock benchmark price index altogether. It was no longer receiving sufficient price quotes to compile the index. The last Georgia Dock benchmark price was published by the GDA on November 23, 2016. Yet for several months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

506.    On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5-to-3 pound broilers that replaced the same weight broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continued to be subject to manipulation by Defendants.

507.    On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November

115

8, 2016, article by the *Washington Post* provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the *Washington Post* article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a *Bloomberg News* article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continued their efforts to conceal the conspiracy alleged in this Complaint.

### M. The Georgia Dock Price Index Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2011

508. Beginning in approximately early 2011, the Georgia Dock price index began to behave differently from Urner Barry and USDA indices. Historically, the Georgia Dock benchmark price had been highly correlated with those other two indices; although the Dock price had always been somewhat less volatile, its movement (i.e., volatility) mirrored the patterns of the other two indices (e.g., prices went up or down depending on market forces). But as hindsight now shows, in 2011, the correlation began to dissolve. Over time periods when the Urner Barry and USDA price indices would decrease, the Georgia Dock would stay flat or sometimes increase. This divergence continued and became especially pronounced in 2015.[9]

---

[9] The prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supra-competitive and artificially inflated by the output-restriction aspect of Defendants' scheme.

509.    The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price, as well as by the fraud perpetrated by the Georgia Dock Defendants.

510.    Starting in early 2011, the monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (i.e., when prices dropped, they dropped far less drastically than they had in the past). This near-disappearance of price volatility was unique to the Georgia Dock. Both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:



511.    When the Georgia Dock component of Defendants' conspiracy kicked into high gear, the Georgia Dock price—for the first time ever—began to materially diverge from the other two indices. Although the other two indices continued to move closely together over time, the Georgia Dock price continued to diverge further and further from those prices. By 2015, the gap

between the Georgia Dock price and the prices on the other two indices was approximately three times greater than it had ever been in recent history, and approximately five to ten times greater than the typical gap between the prices on the other two indices.

**N. Defendants and Co-Conspirators Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to Be Artificially High**

512.    The mechanics by which certain Defendants fraudulently manipulated the Georgia Dock price index is now clear.

513.    The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the PMN. Moreover, the Georgia Dock Defendants fraudulently failed to inform their counterparties—that is, those purchasers to whom they sold poultry on pricing tied to the Georgia Dock—of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of those counterparty purchasers.

514.    By way of background, when the PMN calculated the Georgia Dock price each week, it rounded the price to the nearest 0.25 cents. For example, the Dock price could increase from 110.25 cents to 110.50 cents, but not any amount in between. Defendants also used increments of 0.25 cents in their submissions. Under the PMN's one-cent rule, any submission that was at least one cent more or less than the initially calculated weighted average would be excluded. As a result, on any given week only seven submissions could affect the Dock price: the submission that happened to equal the initial calculation of the weighted average, and submissions that were +0.25 cents, +0.50 cents, +0.75 cents, -0.25 cents, -0.50 cents, and -0.75 cents when compared to the initial weighted average. All other submissions were excluded. Thus, in order to rig the Dock price, Defendants had to work in concert to make price submissions that fell within a narrow range of each other, yet far from the market price, week after week, for years.

515. 

516.

517.     Each of the Georgia Dock Defendants' submissions to the PMN made the implicit

statement that those Defendants were submitting their actual offering price for 2.5- to 3-pound

whole birds for the next week, while in fact those submissions reflected that Defendants were seeking to inflate the Dock price to make money at the expense of their customers.

518.    The allegations set forth below are based on the information regarding Defendants' price submissions.

**1.  Pilgrim's fraudulently made false submissions to the Georgia Dock**

519.    Pilgrim's knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Pilgrim's made false and inflated price submissions as explained below.

520.    Due to its large production capacity, Pilgrim's had a "voice" of 35% (out of a total voice for all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Pilgrim's voice of 35% was by far the weightiest of the Georgia Dock Defendants, and thus its submissions had the greatest influence on setting the Georgia Dock price. Pilgrim's knew that its submissions carried the most weight of any of the Defendants.











t█████████████████████████████████████████████████████

██████████████████████████

538.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

539.    Pilgrim's submissions were false and inflated. Pilgrim's was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Pilgrim's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Pilgrim's costs of production, rather than simply an attempt to artificially inflate the index. Yet Pilgrim's did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ██████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

540.    Pilgrim's knew that its submissions were false and inflated. Pilgrim's knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ At the very least, Pilgrim's acted with reckless indifference as to whether its submissions were false and inflated.

541.    Pilgrim's made its submissions with the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index and increased Plaintiffs' prices. Pilgrim's fraudulent submissions were made by interstate wire.

542.    The intended targets of Pilgrim's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Pilgrim's sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Pilgrim's fraudulent submissions that artificially inflated the Georgia Dock price index, Pilgrim's and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

543.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

**2.  Koch fraudulently made false submissions to the Georgia Dock**

544.    Koch knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Koch made false and inflated price submissions as explained below.



547.

550. ███████████████████████████████████████████

███████████████████████████████████████████████

551. Koch's submissions were false and inflated. Koch was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Koch's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Koch's costs of production, rather than simply an attempt to artificially inflate the index. Yet Koch did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ████ ████████████████████████████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

552. Koch knew that its submissions were false and inflated. Koch knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole ████ ████████████████████████████████████████████████ At the very least, Koch acted with reckless indifference as to whether its submissions were false and inflated.

553.    Koch made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Koch's fraudulent submissions to the PMN were made by interstate wire.

554.    The intended targets of Koch's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Koch sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Koch's fraudulent submissions that artificially inflated the Georgia Dock price index, Koch and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**3. Mar-Jac fraudulently made false submissions to the Georgia Dock**

555.    Mar-Jac knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Mar-Jac made false and inflated price submissions as explained below.



131

559. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

560.     Mar-Jac's submissions were false and inflated. Mar-Jac was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Mar-Jac's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Mar-Jac's costs of production, rather than simply an attempt to artificially inflate the index. Yet Mar-Jac did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere response to the PMN's request for submissions of actual offering prices.

561.    Mar-Jac knew that its submissions were false and inflated. Mar-Jac knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ At the very least, Mar-Jac acted with reckless indifference as to whether its submissions were false and inflated.

562.    Mar-Jac made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Mar-Jac's fraudulent submissions to the PMN were made by interstate wire.

563.    The intended targets of Mar-Jac's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Mar-Jac sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Mar-Jac's fraudulent submissions that artificially inflated the Georgia Dock price index, Mar-Jac and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

### 4.  Harrison fraudulently made false submissions to the Georgia Dock

564.    Harrison knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Harrison made false and inflated price submissions as explained below.





569.

570.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

572.    Like Koch and Mar-Jac, Harrison's practice stabilized the Georgia Dock price index, imposing an artificial floor that prevented the index from falling, while allowing other Defendants (such as Pilgrim's) to artificially inflate the index through their regularly-inflated submissions. Harrison acted in concert with the other Defendants by playing this role.

573.    Harrison's submissions were false and inflated. Harrison was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Harrison's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Harrison's costs of production, rather than simply an attempt to artificially inflate the index. Yet Harrison did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████  Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

574.    Harrison knew that its submissions were false and inflated. Harrison knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  At the very least, Harrison acted with reckless indifference as to whether its submissions were false and inflated.

575.    Harrison made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Harrison's fraudulent submissions to the PMN were made by interstate wire.

576.    The intended targets of Harrison's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Harrison sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Harrison's fraudulent submissions that artificially inflated the Georgia Dock price index, Harrison and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.



578. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

579.    This is further proof that the Defendants worked together to submit knowingly false price quotes to the PMN as part of a coordinated effort to inflate the Dock price.

**5. Sanderson Farms fraudulently made false submissions to the Georgia Dock**

580.    Sanderson Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Sanderson Farms made false and inflated price submissions as explained below.



583.

586. ████████████████████████████████████████

587. Sanderson's submissions were false and inflated. Sanderson was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Sanderson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Sanderson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Sanderson did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ████████████████

████████████████████████████████████████

██████████████████████████████████████Artificially high quotes

constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

588.    Sanderson knew that its submissions were false and inflated. Sanderson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ███ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ At the very least, Sanderson acted with reckless indifference as to whether its submissions were false and inflated.

589.    Sanderson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Sanderson Farms' fraudulent submissions to the PMN were made by interstate wire.

590.    The intended targets of Sanderson Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Sanderson Farms sold chicken to its customers based on the Georgia Dock price index. Sanderson Farms used Georgia Dock-based pricing with its retail customers, including Plaintiffs, in two ways: first, pursuant to a Georgia Dock bracketing system, under which prices would move up or down according to whether they fell in various ranges of Georgia Dock pricing, and second, pursuant to straightforward Georgia Dock formula pricing, under which prices would be the Georgia Dock price plus a specified amount. When the Georgia Dock would increase, that would result in an increase of prices to Sanderson Farms' customers.

591.    Accordingly, as a result of Sanderson Farms' fraudulent submissions that artificially inflated the Georgia Dock price index, Sanderson Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**6. Tyson fraudulently made false submissions to the Georgia Dock**

592.    Tyson knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. Tyson in fact produced a 2.5- to 3-pound bird. But rather than determining its actual offering price and submitting it to the PMN, Tyson made false and inflated price submissions as explained below.

597. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

598.     Tyson's submissions were false and inflated. Tyson was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Tyson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Tyson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Tyson did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████     Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

599.     Tyson knew that its submissions were false and inflated. Tyson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████     At the very least, Tyson acted with reckless indifference as to whether its submissions were false and inflated.

600. Tyson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Tyson's fraudulent submissions to the PMN were made by interstate wire.

601. The intended targets of Tyson's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Tyson sold chicken to its customers based on the Georgia Dock price index. Throughout the relevant period, Tyson sold broilers and broiler products to its customers, including Plaintiffs, pursuant to pricing that used the Georgia Dock price index as a benchmark. Like Sanderson Farms, Tyson employed both bracketed and fixed pricing that used Georgia Dock as basis, dating back to at the latest 2010, when its account managers internally discussed that "where certain customers are not tied to the Georgia Dock market with brackets, we must address these situations."

602. Accordingly, as a result of Tyson's fraudulent submissions that artificially inflated the Georgia Dock price index, Tyson and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**7. Claxton fraudulently made false submissions to the Georgia Dock**

603. Claxton knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Claxton made false and inflated price submissions as explained below.



609.     Claxton knew that its submissions to the PMN were false and inflated. At the very least, Claxton acted with reckless indifference as to whether its submissions were true or false.

610.     Claxton's submissions were false and inflated. Claxton was supposed to submit its actual offering price for 2.5 to 3-pound whole birds. Because broilers are a commodity, Claxton's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Claxton costs of production, rather than simply an attempt to artificially inflate the index. Yet Claxton did not submit its actual or converted offering price for 2.5 to 3-pound whole birds each week. ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

611.     Claxton knew that its submissions were false and inflated. Claxton knew that it was supposed to submit its actual or converted offering price for 2.5 to 3-pound whole birds ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ At the very least, Claxton acted with reckless indifference as to whether its submissions were false and inflated.

612.     Claxton made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Claxton's fraudulent submissions to the PMN were made by interstate wire.

613.     The intended targets of Claxton's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Claxton sold chicken to its customers based on the Georgia Dock

price index. Accordingly, as a result of Claxton's fraudulent submissions that artificially inflated the Georgia Dock price index, Claxton and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

### 8. Wayne Farms fraudulently made false submissions to the Georgia Dock

614. Wayne Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Wayne Farms made false and inflated price submissions as explained below.



████████████████████████████████████████████████

██████████████

618.    For instance, Lee Matthews made these false submissions by phone on behalf of Wayne Farms to Arty Schronce and Demetria Mabry of the PMN, at or approximately at the same date and time each week, for several years.

619.    Wayne Farms' submissions were false and inflated. Wayne Farms was supposed to submit its actual offering price for 2.5- to 3-pound whole birds. Because broilers are a commodity, Wayne Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Wayne Farms' costs of production, rather than simply an attempt to artificially inflate the index. Yet Wayne Farms did not submit its actual or converted offering price for 2.5- to 3-pound whole birds each week. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

620.    Wayne Farms knew that its submissions were false and inflated. Wayne Farms knew that it was supposed to submit its actual or converted offering price for 2.5- to 3-pound whole birds ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ At the very least, Wayne Farms acted with reckless indifference as to whether its submissions were false and inflated.

621.     Wayne Farms made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Wayne Farms' fraudulent submissions to the PMN were made by interstate wire.

622.     The intended targets of Wayne Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Wayne Farms sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Wayne's fraudulent submissions that artificially inflated the Georgia Dock price index, Wayne Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**9.  Fieldale Farms also made false submissions to the Georgia Dock**

623.     Fieldale knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5- to 3-pound birds. But rather than determining its actual offering price and submitting that price to the PMN each week, Fieldale knowingly made false and inflated price submissions as explained below.

624.     Due to its large production capacity in Georgia, Fieldale had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Fieldale's voice of 15% put it among the top three weightiest voices among the Georgia Dock Defendants, and thus its submissions had a significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to other Defendants' submissions.





630.

631.    Fieldale knew that its submissions to the PMN were false and inflated. At the very least, Fieldale acted with reckless indifference as to whether its submissions were true or false. Fieldale made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Fieldale's fraudulent submissions to the PMN were made by interstate wire.

632.    The intended targets of Fieldale's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Fieldale sold chicken to its customers, including Plaintiffs, based on the Georgia Dock price index. Accordingly, as a result of Fieldale's fraudulent submissions that artificially inflated the Georgia Dock price index, Fieldale and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**O. The Georgia Dock Defendants Fraudulently Failed to Inform their Customers of their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock**

633.    All of the Georgia Dock Defendants sold broiler chicken at prices based off of the Georgia Dock to customers during the relevant period. ███████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

        ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████

        ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████

636.    ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████

637.     Thus, not only did the Georgia Dock Defendants knowingly make false submissions to the PMN for the purpose of inflating the Georgia Dock price index, but all of the Georgia Dock Defendants failed to disclose significant, non-public information to purchasers about the Georgia Dock price index and the Poultry Market News.

638.     Just as Defendants' role on the PMN Advisory Committee enabled Defendants to devise a scheme to manipulate the Georgia Dock, Defendants' role on the Advisory Committee created an information asymmetry that kept chicken buyers in the dark. Unlike Defendants, which had intimate knowledge of the way in which the PMN operated and the Georgia Dock price was calculated, purchasers believed: that the Georgia Dock price index represented the actual offering prices of chicken producers for the next week—in other words, an actual market price for broilers based on verified, reliable, and objective information.

639.     All of the Georgia Dock Defendants knew they were submitting price quotes to the PMN each week, and that those quotes were being used by the PMN to calculate the Dock price. All of the Georgia Dock Defendants knew how the Georgia Dock price index was calculated and that, unlike with the Urner Barry and the USDA Composite indices, the PMN obtained no information from buyers. All of the Georgia Dock Defendants knew that the PMN was not undertaking any effort to validate their submissions, such as by requiring Defendants to submit copies of their actual price sheets or invoices. Yet none of the Georgia Dock Defendants shared this significant, non-public information with purchasers.

640.     All of the Georgia Dock Defendants knew of the existence of the PMN Advisory Committee and its control over the PMN and Georgia Dock price index. Specifically, the Georgia Dock Defendants knew that the Advisory Committee had the power to reevaluate the Georgia Dock price, to change the way in which the Dock price was calculated, and to influence who would

be hired as the next Director of the PMN. The Georgia Dock Defendants also knew that the Advisory Committee consisted exclusively of representatives of chicken producers and not buyers or neutral third parties and that Defendants' then-current and former lobbyists supported the Advisory Committee and independently exercised control and influence over the PMN. Yet none of the Georgia Dock Defendants shared this significant, non-public information with purchasers.

641.  All of the Georgia Dock Defendants knew they were conspiring with each other and part of an enterprise of Defendants that were associated in fact and did in fact submit false and inflated price quotes to the PMN for the purpose of inflating the Georgia Dock price index for their benefit and purchasers' detriment. Yet none of the Georgia Dock Defendants this significant, non-public information with purchasers.

642.  The Georgia Dock Defendants gave buyers of chicken the false impression that those Defendants were submitting their actual offering prices for 2.5- to 3-pound whole birds for the next week, instead of making submissions to the PMN to benefit their position as sellers of chicken.



645.    The Georgia Dock Defendants intentionally failed to disclose this significant, non-public information in their communications with their customers regarding their transactions for the purchase and sale of chicken. By intentionally failing to disclose this information, the Georgia Dock Defendants were attempting to induce a false belief by buyers of chicken about the reliability of the Georgia Dock price index. Defendants intended to induce this false belief by customers for the benefit of the Georgia Dock Defendants.

646.    The Georgia Dock Defendants knew that purchasers believed the Georgia Dock was a reliable price index and intentionally perpetuated that belief by failing to disclose this significant, non-public information. The Georgia Dock Defendants knew that their customers had little to no knowledge regarding how the Georgia Dock price index worked, because their customers had no ability to obtain such knowledge.

647.    The Georgia Dock Defendants were successful in inducing a false belief by purchasers about the reliability of the Georgia Dock price index. Purchasers believed the Georgia Dock price index was reliable until information suggesting the Dock price may have been inflated was finally made public in late 2016.

648.    The Georgia Dock Defendants made these omissions when they communicated with purchasers; when they bid on, offered, negotiated, and pitched purchasers' business; and also when they contracted with purchasers. Many of the communications in which the Georgia Dock Defendants failed to disclose significant, non-public information to customers were made via interstate wires (both email and phone).

649.     Even if the origin and ultimate destination of any Defendants' wire communications referenced in this Complaint were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.



651. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

652.     Through their fraudulent acts and omissions, the Georgia Dock Defendants were successful in inducing a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index. Either through contracts directly indexed to the Georgia Dock price, or through pricing negotiations indirectly (but materially) influenced by the Georgia Dock price, all Plaintiffs paid inflated prices due to Defendants' manipulation of the George Dock index.

653.     The Georgia Dock Defendants' scheme deprived their victims of valuable economic information and depended for its completion on failure to disclose an essential element of the bargain.

**P. The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market**

654.     In addition to their material omissions, the Georgia Dock Defendants that did business with Plaintiffs also made false statements and affirmative misrepresentations about material facts to Plaintiffs over the relevant period. The Georgia Dock Defendants knew that the Georgia Dock did not represent the broiler market because they did not submit their actual prices to the Poultry Market News. But they told Plaintiffs that the Georgia Dock represented the market price for broiler chicken regardless.

655.     This practice was widespread: throughout the relevant period, the Georgia Dock Defendants stated, repeated, and maintained that the Georgia Dock represented the market for broilers, and they did so in a deliberate attempt to influence the business decisions made by customers like Plaintiffs.

656.     The Georgia Dock Defendants made these false statements and affirmative misrepresentations to Plaintiffs via telephone, in person, in writing, and over email in connection with their bids, pitches, offers, negotiations, and contracts with Plaintiffs. Thus, many of these fraudulent misrepresentations were made via interstate wires (both email and phone). As above, even if the origin and ultimate destination of any Defendants' wire communications were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.

659.     Additionally, Georgia Dock Defendants often asked for cost adjustments when the Georgia Dock continued to rise, even if the parties had a pricing arrangement that was not expressly tied to the Georgia Dock.

661. 

662.     The Georgia Dock Defendants knew that buyers of chicken, including Plaintiffs, believed the Georgia Dock to be a reliable price index and intentionally perpetuated that belief by making fraudulent misrepresentations promoting it.

663.     Plaintiffs relied on the Georgia Dock Defendants' false statements and affirmative misrepresentations about the Georgia Dock representing the broiler "market." As a result, Plaintiffs purchased broiler chicken based on Georgia Dock prices.

**Q. Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations**

664.     Plaintiffs bought broiler chicken based on pricing expressly tied to the Georgia Dock from Georgia Dock Defendants.

665.     Plaintiffs adjusted pricing of broiler products on multiple occasions after being asked to adjust such prices due to increases in the Georgia Dock, even when the Georgia Dock did not form the basis of the pricing agreement with the supplier who asked for an increase. ▮▮▮

666.     Buyers of poultry, including Plaintiffs, were the targets of the Georgia Dock Defendants' fraudulent submissions to the PMN, and Plaintiffs reasonably relied on the veracity of those submissions.

667.     Georgia Dock Defendants falsely submitted prices to Poultry Market News and, as detailed above, artificially inflated the Georgia Dock. The Georgia Dock price index was artificially inflated from no later than early 2011 through 2016 as a result of certain Defendants' fraudulent acts and omissions. Plaintiffs had no reason to know that the Georgia Dock price index was inflated due to Defendants' fraudulent acts, misrepresentations, and omissions.

668.     Therefore, by using the Georgia Dock as the basis for the price of broiler chickens it purchased, whether pricing was expressly tied to the Georgia Dock or whether a price increase was requested based on an increase in the Georgia Dock, Plaintiffs overpaid and were harmed due to the Georgia Dock Defendants' fraud.

## R. Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So

669.     The broiler chicken industry's long history of boom and bust cycles is well known to Defendants. For example, in 2008, the entire poultry industry was profoundly affected by the bankruptcy filing of Pilgrim's Pride, which was then the largest poultry company in the United States. In its filing, Pilgrim's disclosed that it had lost $998.6 million for the fiscal year, or $14.40 per share, prompting Pilgrim's shares to lose over 46 percent of their value in one day. The collateral effects of this announcement reverberated throughout the industry, with several other leading poultry companies, such as Tyson and Sanderson, also experiencing sizable losses. By the time Pilgrim's emerged from bankruptcy in December 2009, the industry was still struggling to make money, prompting a wave of consolidation and many of the collusive and fraudulent activities outlined in the Complaint.



671.

672.    As noted above, Defendants knew that the Georgia Dock was vulnerable to manipulation and thus presented Defendants with the unique opportunity to collude and/or defraud their retail grocery customers in pursuit of higher profits, thus ensuring that Defendants had both the motive and opportunity to manipulate the index.

673.    The manipulation of the Georgia Dock by Defendants served its intended purpose, enabling Defendants to bolster their financial results at their customers' expense. Indeed, in some instances, the manipulation of the Georgia Dock allowed Defendants to recognize a profit instead of a loss. For example, Mike Cockrell, Chief Financial Officer of Sanderson Farms, publicly stated in the New York Times that Sanderson was profitable in the fourth quarter of 2015 "only because we were making money from the chicken we were selling to the retail market." Moreover, according to other published analyses, poultry companies such as Pilgrim's and Sanderson would

have realized negative earnings and income in 2016 but for the profits realized from their sales based on the Georgia Dock.

674. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

675. Defendants acted with fraudulent intent and knew that their manipulation of the Georgia Dock was improper. ████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

676. But Defendants did not care. Instead, they intentionally pushed the Georgia Dock on unsuspecting retail grocery customers to ensure their own continued profitability (and secure lucrative individual bonuses for themselves). ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████

**S.  Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs**

677.     The Georgia Dock Defendants' fraudulent acts and omissions were not committed individually, but rather as part of the affairs of an enterprise whose purpose was to obtain excessive poultry proceeds by defrauding chicken buyers, including Plaintiffs.

678.     The enterprise was the group of Georgia Dock Defendants, which were associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement in the Georgia Poultry Federation, and their use of the Dock in selling product. This enterprise was a continuing unit that associated together and acted with a common purpose: to sustain the existence of the PMN and Georgia Dock and to artificially inflate the Dock price for the benefit of the enterprise and the individual Defendants.

679.     There have been many relationships among those associated with the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one of the Georgia Dock Defendants participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock as discussed above.

680.     All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbyist in Georgia for poultry producers. All of the Georgia Dock Defendants had positions on the Board of the Georgia Poultry Federation. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation (such as Abit Massey and Mike Giles). Those same leaders helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed herein.

681.     The enterprise had longevity that was sufficient to permit those associated to pursue the enterprise's purpose. There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry

Federation, and submitted price quotes to the PMN. The scheme of the Georgia Dock Defendants to manipulate the Georgia Dock price by making false and inflated price quotes, as discussed in this Complaint, began no later than early 2011 and lasted for at least five years.

682. Not only were the Georgia Dock Defendants a part of this enterprise, but they acted in concert with each other in their fraudulent acts and omissions. 

683. The same was true with respect to the Georgia Dock Defendants' fraudulent omissions. If any of the Georgia Dock Defendants had disclosed their knowledge about the lack of verification for their price submissions to the PMN, their ability to manipulate the Georgia Dock price index, or the fact they were manipulating the Georgia Dock price index, then all buyers would have lost confidence in the Georgia Dock earlier than the end of 2016. That was important, non-public information that only the Georgia Dock Defendants had in their possession. Because all of the Georgia Dock Defendants collectively benefited from their non-disclosure, the Georgia Dock Defendants worked in concert not to disclose this information.

**T. The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith**

684. Throughout the relevant period, the Georgia Dock Defendants entered into contracts and exchanged pricing sheets and invoices with customers, including Plaintiffs, that

priced broiler chicken based on the Georgia Dock. Pursuant to these agreements, the prices charged by the Georgia Dock Defendants to Plaintiffs were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost.

685.    Plaintiffs' broiler chicken contracts came in many forms, including oral agreements, formal written supply agreements, and other written agreements, including agreements made via email, purchase orders, and invoices. ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████ An implied covenant of good faith and fair dealing was implied in all of the contracts between Plaintiffs and the Georgia Dock Defendants.

686.    Agreements that used Georgia Dock bracketing to determine the price of broiler chicken typically included the price at which broiler chicken would be sold to Plaintiffs depending on whether the Georgia Dock fell into one of multiple (usually three) brackets. Contracts that pertained to more than one broiler product typically listed item codes and descriptions in rows, with corresponding prices set out for each bracket. The price Plaintiffs paid for a given sale depended on what the Georgia Dock price was each week, and where it fell in the brackets listed. Throughout the relevant period, the Georgia Dock Defendants who used such bracketing systems had to add new bracket ranges on the high end to account for the "uncharted territory" into which the Georgia Dock entered.

687.    Other agreements specified that Plaintiffs would pay a fixed amount over the Georgia Dock pricing index's quotes for a given week. This could take several different forms, whether by adding a percentage or a certain number of cents to the Georgia Dock price. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

688.    Even where a contract had a fixed price, those prices were often based off of the

Georgia Dock as an indicator. ████████████████████████████████

████████████████████████████████████████████

689.    Regardless of which Georgia Dock pricing arrangement was used, the material

pricing terms of the Georgia Dock Defendants' broiler chicken contracts provided that the amount

charged to Plaintiffs would be predicated on the Georgia Dock. None of these arrangements

allowed the Georgia Dock Defendants to operate and control the Georgia Dock or to use their

pricing submissions to PMN to falsely inflate each week's Georgia Dock price above the actual

average offering price. Such a scheme undermined all validity to the Georgia Dock pricing system

as being reflective of actual average offering prices, and gave the Georgia Dock Defendants the

ability to maneuver their prices skyward, so long as on a week-to-week basis they stayed within

the two-cent range permitted by the PMN. At the same time, the secrecy behind which the Georgia

Dock Defendants kept the Georgia Dock shrouded deprived customers like Plaintiffs of any ability

to uncover and detect that their purchases were based on an inflated pricing index.

## U.  Defendants used the Georgia Dock Manipulation To Impact Higher Prices Charged to Contract Purchasers

690.    Defendants' manipulation of the Georgia Dock not only had an anticompetitive

effect on the prices of broilers that were based directly on the Georgia Dock; it also contaminated

and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.

691.    Defendants also used the artificial prices reported on the Georgia Dock index to

justify price increases to their contract purchasers. This was especially the case during the later

part of the conspiracy when the Georgia Dock index deviated so dramatically from the Urner Berry and USDA Composite indices. It was true, moreover, even with respect to Defendants that did not submit pricing information to Georgia Dock.

692.    When Defendants engaged in negotiations with restaurants and other contract purchasers of broilers, and sought to explain why they were "forced" to increase prices, one of the main explanations that they used to justify the price increases was the artificially inflated Georgia Dock index. Defendants independently could not have provided restaurants and other contract purchasers with the same false explanation for price increases without coordinating the messaging.

## V.  Defendants' Bid-Rigging Conduct

693.    Beginning at least as early as 2012 and continuing at least into 2019 ("Bid-Rigging Conduct Period"), Defendants and the Co-Conspirators engaged in a conspiracy to rig bids submitted for broilers sold to restaurants and other contract purchasers, with the intent to artificially inflate the prices paid by these customers.

694.    As part of their procurement process, many restaurants and other contract purchasers ("Bid Customers") requested proposals or bids from Defendants for the volume of chicken needed. The Bid Customers received bids from Defendants throughout the Bid-Rigging Conduct Period.

695.    The Bid Customers expected Defendants to engage in a competitive bidding process, which when complete, would allow the Bid Customers to award its contracts to the most competitive bidder(s). Defendants, however, recognized that the Bid Customers offered an additional opportunity to effectuate their conspiracy.

696.    Defendants' and the Co-Conspirators' bid-rigging conduct took multiple forms. At its most basic level, Defendants and the Co-Conspirators exchanged confidential information with

each other regarding the bids they were submitting, or intended to submit, to specific identified Bid Customers, so that all supposedly competitive bids were aligned.

697. On June 3, 2020, the Department of Justice issued an Indictment against officers of certain Defendants in the District of Colorado founded on Defendants' and the Co-Conspirators' bid-rigging conduct (the "June Indictment"). The June Indictment charged Jayson Penn, President and CEO of Pilgrim's Pride, Mikell Fries, President of Claxton, Scott Brady, Vice President of Claxton, and Roger Austin Vice President of Pilgrim's Pride (the "First Indicted Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act. [11]

698. Specifically, the June Indictment alleged that from at least 2012 through at least 2017, the First Indicted Defendants and at least seven broiler chicken suppliers conspired:

- to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States;

- to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

- to monitor bids submitted by, and prices and price-related terms, including discount levels and lines of credit, offered by, Suppliers and Co-Conspirators for broiler chicken products sold in the United States.

---

[11] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Colo. June 2, 2020) [D.E. 1].

699.    The June Indictment expressly identified as victims of the First Indicted Defendants' conspiracy "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices or other price-related terms, including discount levels, with Suppliers directly."

700.    The June Indictment set forth a series of communications between Defendants and the Co-Conspirators—via phone, email, and text messages—sharing and coordinating confidential bidding and pricing information in connection with multiple restaurant and grocer victims' requests for bids.

701.    On October 7, 2020, the Department of Justice issued a Superseding Indictment in the District of Colorado, again founded on Defendants' bid-rigging conduct (the "Superseding Indictment"). The Superseding Indictment charged six additional executives, including Tim Mulrenin (Tyson/Perdue), Bill Kantola (Koch), Jimmie Little (Pilgrim's Pride), Bill Lovette (Pilgrim's Pride), Brian Roberts (Tyson/Case Foods), and Ric Blake (George's) (together with the First Indicted Defendants, the "Criminal Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[12]

702.    The Superseding Indictment expanded the bid-rigging conduct period from at least as early as 2012 through at least early 2019, and stated that the bid-rigging conduct included but was not limited to ten different broiler chicken suppliers.

703.    The Superseding Indictment also charged Defendant Jimmie Little with two additional counts for False Statements and Obstruction of Justice.  The Superseding Indictment

---

[12] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Colo. June 2, 2020) [D.E. 101].

alleged that during an interview with special agents of the United States Department of Commerce and the Federal Bureau of Investigation, Little "knowingly and willfully made false statements to federal law enforcement agents." Specifically, "LITTLE stated words to the effect that (a) he had no contact with individuals at competing Suppliers outside of speaking to the individuals at industry trade shows; and (b) he had not called-or sent text messages to—any individuals at competing Suppliers. The Statements were false. As LITTLE then and there knew, he indeed had contact with individuals at competing Suppliers outside of trade shows, and had called and sent text messages to individuals at competing Suppliers."

704.    The Obstruction of Justice count alleges that "LITTLE corruptly obstructed, influenced and impeded official proceedings, and corruptly attempted to obstruct, influence, and impede official proceedings, pending and about to be instituted in the District of Colorado, *to wit*, the pending grand jury investigation of price fixing in the broiler chicken industry, the pending prosecution of four individuals for conspiring to fix prices in the broiler chicken industry, and the then-about-to-be-instituted prosecution of LITTLE for conspiring to fix prices in the broiler chicken industry."

705.    On October 13, 2020, the Department of Justice filed an Information charging Pilgrim's Pride.[13] The Information states that "[b]eginning at least as early as 2012 and continuing through at least early 2019 . . . [Pilgrim's Pride] and its co-conspirators entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by Defendant and its co-conspirators was a

---

[13] *United States of America v. Pilgrim's Pride Corporation.,* Crim. Action No. 1:20-cr-00330-RM (D. Col. October 14, 2020) [D.E. 1].

*per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."

706.    As a result of the bid-rigging conduct, pricing to the Bid Customers, for broilers was elevated. The Bid Customers was injured in their business or property by paying more for broilers than they would have paid in the absence of the conspiracy.

**W. The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion**

707.    ***Highly-Concentrated Market with Vertically-Integrated Producers***. A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.

708.    According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.

709.    In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.



710.   As of 2015, Defendants controlled 88.8% of Broiler production in the United States.

Since the start of the relevant time period, there has been surprising stability in market share for

each Defendant, as shown by the graph below.



711.   Defendants now collectively control nearly 90 percent of the U.S. wholesale

chicken market.

712.   The U.S. chicken industry is almost entirely vertically integrated, with Defendants

(known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick-

rearing, feeding, processing, and selling.

713. ***Inelastic Demand at Competitive Prices***. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue.

714. Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years.

715. In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist Michael Dicks presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions. He stated that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year … Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

716. ***Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats***. The existence of industry trade associations makes a market more susceptible to collusive behavior because such associations provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation. Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting, and punishing cheating.

717. The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy: National Chicken Council ("NCC"), United States Poultry & Egg Export

173

Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, Poultry Federation (representing chicken producers in Arkansas, Missouri, and Oklahoma), and the International Poultry Council.

718.    According to Communication in Poultry Grower Relations: A Blueprint to Success, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups. The book notes that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that which is good for individual companies is good for the industry."

719.    Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is customary. For example, NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States."

720.    The CEOs of the top integrated broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

721.    The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives. Every Defendant and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison Poultry, Keystone, and Allen Harim. Amick President and CEO Ben Harrison, who served on the NCC Board of Directors throughout the relevant time period, was NCC's Chairman in 2018. CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along

with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October.

722.    Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize, and golf, hunt, or fish together. Defendants and Co-Conspirators also hold positions of power within the NCC. For example, Amick President and CEO Ben Harrison, served on the NCC Board of Directors throughout the relevant period, and subsequently served as NCC Chairman. Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the relevant period serving on the Board of Directors and as President during that time. Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan (Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice President for U.S. Poultry and Fish), were also members of the NCC during the relevant period. William Andersen of Keystone Foods was also appointed to the board of directors for a three year term during the 2010-11 NCC cycle. Andersen was heavily involved with the NCC, assisting in preparation of annual reports and management reports, and preparing and sharing market reports including graphs on chicken production, eggs set, chick placements, hatching layers, and egg production.

723.     Similarly, Defendants and Co-Conspirators, and their senior executives, regularly attend the Georgia Poultry Federation's meetings (usually held in April, August, and September). The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." Defendants and Co-Conspirators House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Keystone Foods are members of the Georgia Poultry Federation. Keystone Foods' Clay Banks served as Chairman of the Georgia Poultry Federation during 2014-2015.

724.     Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating, if any, in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel.

725.     **Investor Conferences.** Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

726.     **Competitor Plant Tours.** Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company.

While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.

727.     As additional examples of Defendants sharing competitive and sensitive information with each other, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

728.     Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's. Similarly, Clint Rivers, Pilgrim's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of Business Development. Numerous other high level and well as lower level

executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.

729.     **Mergers and Acquisitions.** Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016. These merger and acquisition discussions include both completed agreements, such as those described in Section V(E)(4) of this Complaint, as well as proposed transactions that were never completed. In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.

730.     In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions. In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.

731.



732.

733. 

734. ***Further Restricting Breeder Flock Supply and Sharing of Future Plans Through So-Called Strategic Alliances and Joint Ventures***. Defendants and their Co-Conspirators facilitated the sharing of future plans for the slaughter of so called "fowl" including spent hens through a so-called "strategic alliances" and joint ventures, which also gave the Defendants and Co-Conspirators additional opportunities to implement the supply-restriction mechanism of their conspiracy, and achieve additional profits, by sending "spent hens," which are breeder hens that can no longer lay eggs, as well as roosters (which along with spent hens, are sometimes collectively referred to as "fowl,") to so-called "hen houses" for slaughter for meat consumption.

735. Because, unlike the broilers produced by the Defendants and Co-Conspirators, hen houses had the capacity and equipment necessary to slaughter larger birds – often called "heavy fowl," which are spent hens and roosters weighing up to eight pounds – hen houses became a critical part of the Defendants' supply-restriction mechanism of their conspiracy by allowing them to send their breeder hens to slaughter at younger and younger ages, further reducing supply at the very top of the supply chain. Sending breeder hens to hen houses for slaughter while they were still capable of laying eggs – that is, before 65 weeks of age – allowed the Defendants and Co-Conspirators to use information provided by both Agri Stats (which tracked average slaughter age, as detailed above) and the hen houses (which tracked and disseminated to their members similar

information) to project their own supply and also gain insight into the supply reductions of their ostensible competitors who were also members of such "strategic alliances."

736.    Discovery to date has uncovered the participation of the Defendants and their Co-Conspirators in two such entities, Non-Producer Co-Conspirator Tip Top and Non-Producer Co-Conspirator Southern Hens.

737.    The **Tip Top** Alliance was formed in 2009 by Defendants Case Farms, House of Raeford, Keystone, Mar-Jac, Mountaire, Perdue, Harrison, and Wayne Farms, and Co-Conspirators Amick Farms and Fieldale Farms, who were later joined by Defendants Pilgrim's and Simmons. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Members of the Tip Top Alliance held quarterly conference calls, and met in person at least once a year during the annual International Chickens Conference in Atlanta. Brad Respess, the president of Tip Top, regularly sent emails, as well as quarterly performance reports, to all members of the alliance, and Mr. Respess also regularly received industry information from Agri Stats' Mike Donahue.

738.    ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Rendering hens for non-food use has next to no value compared to slaughtering them for food, which means that the Tip Top alliance members gave up

a profit from Tip Top in order to cut back on broiler production by sending breeder hens to slaughter far earlier than they would otherwise have done in a truly competitive market.

739.   Communications between Mr. Respess and alliance members allowed each alliance member to know that its fellow alliance members were, consistent with the supply-restriction mechanism of their conspiracy, cutting broiler production by increasing their shipments of younger and younger breeder hens to Tip Top, taking supply out of the market at the very top of the supply chain.





744.

745.     In addition to providing information by which its alliance members could (and did) coordinate their collusive supply-restriction scheme, Tip Top readily gave such information to non-alliance members,

746. **Southern Hens**, based in Moselle, Miss., was a joint venture formed by Defendants that facilitated the sharing of confidential information. Southern Hens is described in its corporate filings as a poultry processing business. It processes spent breeder hens for chicken producers including its joint owners. Southern Hens' Board has included representatives from Aviagen, as well as Defendants Sanderson Farms, Koch, Foster Farms, OK Industries, Pilgrim's Pride, Mar-Jac, Peco Foods, and George's.

747. The Board representatives have infrequently changed over the years. For example, Bob Rosa (Sanderson Farms), served on the Board from at least 2007 through 2017. Lance Buckert and Mark Kaminsky (Koch) also served during this same time-period, as did Denny Hickman (Peco Foods) and Ben Thompson (Aviagen). Melissa Durbin (Marshall Durbin) served on the Board from at least 2008 until 2014 when Mar-Jac replaced Marshall Durbin after its acquisition. Bob Kenney (George's) served on the Board from 2010 through 2017. Other Board members have included Monty Henderson (George's); Bob Hendrix, Walt Shafer, and Randy Stroud (Pilgrim's); Pete Martin (Mar-Jac); and Tim Garber and Terry Thompson (Foster Farms).

748. Southern Hens has also had the same General Manager, John Comino, since 1998. Comino regularly communicated with board members and helped to facilitate Defendants' sharing of information with each other. For example, Comino attended NCC meetings on behalf of Southern Hens, and served on the Board of Directors with representatives from several Defendants, including Pete Martin (Mar-Jac), Gary George (George's), and Trent Goins (OK Foods).

749.   Comino also shared plans for production cuts among Defendants who used Southern Hens as a means to achieve these coordinated activities. ███████████

750.   ***High Barriers to Entry***. The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market. In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies—such as Defendants—are able to raise prices above competitive levels and still earn above-normal levels of profits.

751.   The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry. Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market

such as Defendants—are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels. These high entry barriers also extend to large foreign meat conglomerates that have acquired U.S. broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. broiler company as a subsidiary. Ownership of U.S. broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. broiler production business.

752.    **History of Government Investigation and Collusive Actions.** In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti-competitive monopolistic behavior in the meat-packing industry, Congress passed the Packers and Stockyards Act ("PSA"). See 7 U.S.C. § 193(a), § 209. Congress amended the law to include the poultry industry in 1935.

753.    In 1922, the Supreme Court upheld the constitutionality of the PSA in Stafford v. Wallace, finding that "the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer."

754.    In April 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members from continuing

a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.

755.     Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.

756.     In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (United States v. George's, Inc.), which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.

757.     According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

## X.  Defendants Collusively Adopted Additional Strategies To Reinforce Their Conspiracy

758.     Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

759.    *A Collective Shift Away From Long-Term Fixed-Price Contracts*. First, particularly with respect to certain distributor and grocer customers, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner Barry, and the Georgia Dock). A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helped facilitate a market-wide antitrust conspiracy. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002). This was true even with respect to restaurants and other purchasers that continued to enter into term contracts with Defendants.

760.    Defendants' shift indicates that they anticipated higher, or artificially inflated non-competitive, prices resulting from their production cuts, and wanted the flexibility to take advantage of such prices without being locked in to longer-term, lower-pricing commitments to certain distributor and grocer customers.

761.    Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts.

762.    This change coincided with Defendants' efforts to reduce chicken industry supplies to drive chicken market prices higher.

763.    On January 28, 2008, Tyson CEO Richard Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

764.    The next day, on January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a

situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

765.     On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

766.     Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

767.     On an August 6, 2012 earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move—prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

768.     This collusive and coordinated shift toward reducing the number of longer-term fixed-price contracts had the intent and effect of creating supra-competitive market prices for broilers to all customers, including those customers who continued to enter into term contracts with Defendants.

███████ ***Coordinated Denial of Lines of Credit***. ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

770.    ***Inter-Defendant Sales***. Third, the Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.

771.    In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

772.    In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."

773.    Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique,"

because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."

774.    Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow conspirators would maintain their production levels as they were and not increase them.

775.    

776.

███████████████████████████████████

███████████████████████████████████

███████

777.    In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

778.    In a July 9, 2012 article, Donnie Smith of Tyson was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

███████████████████████████████████

███████████████████████████████████

███████████████████████

780.    On a January 31, 2014, earnings call, Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand . . . ."

781.    By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week. Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

782.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels. Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second

half of 2015 and 2016. Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.

783.    Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

784.    ***Atypical Increases in Exporting of Chickens***. Fourth, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.

785.    Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."

786.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

787.    Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and artificially inflate the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.

788. Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in supra-competitively higher overall U.S. chicken prices.

**Y.      Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy**

789. The USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats received from Defendants, and then provided to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.

790. Agri Stats is a company that generated confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

- Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

- Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

- Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

- Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

- Inventory levels of chickens; and

- Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

791.    Agri Stats collected data from Defendants, audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involved—from and to Defendants—direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.

792.    At each of Defendants' chicken complexes, certain employees, typically in the accounting department, were responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats used a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.

793.    Agri Stats described itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

794.    Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous—the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

795. However, contrary to these assertions, Defendants were at all material times able to (and did) readily determine "whose numbers the numbers belong to." Indeed, each Defendant knew that when it provided its internal, confidential information to Agri Stats, the other producers would be able to access that information and identify the Defendant that submitted it.

796. There was no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor was there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants. Instead, it was provided, compiled, and transmitted for anti-competitive purposes.

797. Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel—for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.

798. Agri Stats' detailed statistics—coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives—serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

799. Agri Stats claimed to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken

complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.

800.    But, by design, Agri Stats reports were so detailed that any reasonably-informed producer could easily discern the identity of its competitors' individual chicken complexes. It is common knowledge among producers that others could do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

801.    After Tyson rejoined Agri Stats in 2008 and Perdue joined with all of its plants also in 2008, at least 95% of the Broiler Producers in the united States subscribed to Agri Stats providing most of its revenues and providing and receiving the detailed Agri Stats reports which were easily deciphered by the various producers so that they all knew the detailed information set forth hereafter about each other.

802.    Agri Stats reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.

803.    Specific complexes were easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees—some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats—to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

804.    In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allowed for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The coding system has never changed (e.g., the Tyson complex in Cummings, Georgia has always been identified as complex

"222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data in perpetuity.

805.    Agri Stats played a particularly important role in Defendants' signaling practices and policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allowed any given Defendant to "reverse-engineer" and interpret the public statements and other publicly available information about its competitors to determine which complexes were cutting back, and by how much.

806.    For example, if in January, a Defendant publicly states its intention to reduce production—even generically, without specifying which complexes will cut back, or by how much—all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim's, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies could use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

807.    Each Defendant and other Co-Conspirators received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.

808.    Defendants' complex managers typically received the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' and co-conspirators' top executives received Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contained one row for each

chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.

809.    Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permitted Defendants and Producer Co-Conspirators to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, included line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

810.    Information helping Defendants and Producer Co-Conspirators to assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age, in weeks (e.g., "63.22" or "51.76") of the hens whose eggs, when hatched, became the chickens later killed for meat consumption and supplied to Plaintiffs and other chicken buyers.

811.    The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiffs and other chicken buyers.

812.    The bird-age data from the "Growth Rate Report" also shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much

longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month can help determine when flocks were being slaughtered and removed from the supply chain (e.g., if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

813.    The "Actual Live Production Cost" section of an Agri Stats report also included (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."

814.    Knowing the number of complexes each Defendant operates in each sub-region—which, as detailed above, appeared by name at the very beginning of the Agri Stats reports—any Defendant could, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

815.    Discovery in this action has confirmed that Defendants often exchanged Agri Stats information directly with one another. For instance, on March 24, 2009, Koch CFO Joe Grendys wrote to Amick VP of Sales and Marketing Steve Kernen, inquiring whether Amick had "Any luck yet on agristats #."

817. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████

818. Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively sensitive data. It was an active and knowing participant in, and facilitator of, Defendants' scheme, along with the Producer Co-Conspirators.

819. Agri Stats' employees would confirm for Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives presented on a regular basis.

820. Nearly all of the Agri Stats Broiler division account managers responsible for Defendant and Co-Conspirator accounts during the relevant period were former employees of one or more Defendants and their Co-Conspirators and at least one senior account manager left Agri Stats to join Pilgrim's. This revolving door among the Defendants, their Co-Conspirators and Agri Stats included current or former Agri Stats employees: ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



821.    During the relevant period, Agri Stats offered a service to Defendants and Producer Co-Conspirators whereby each quarter – but oftentimes far more regularly than that, in some instances two or three times per month – personnel from Agri Stats would meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder, and feed departments. The executive-level meetings, referred to as "quarterly reviews" or "executive reviews," often lasted several days, and were attended by one or more Agri Stats account managers, often accompanied by Agri Stats vice president Mike Donohue, along with C-suite personnel from the Defendants or Producer Co-Conspirators. These multi-day meetings would touch on a range of competitively-sensitive topics, including the Defendants' and Co-Conspirators' profits, sales, margins, operating rates and capacity, including flock or egg-placement reductions.

▮▮    Throughout the relevant time period, Agri Stats executives and account managers fanned out across the chicken-producing regions of the country to meet with their clients and co-conspirators, the Defendants and Co-Conspirators. ▮▮▮▮

▮▮▮▮



823.    Similar meetings happened day after day, week after week, month after month, year after year, and ensured the success of the production-restriction mechanism of Defendants' conspiracy. In addition, roughly every month, Agri Stats account managers would convene account

manager meetings – sometimes at Agri Stats' Fort Wayne headquarters, sometimes closer to Mike Donohue's home office in Rhode Island, and sometimes over the phone – which gave Agri Stats employees the opportunity to share information about their various accounts, which could then be relayed to their clients, the Defendants and their Co-Conspirators, at one or more of their subsequent meetings.

824.    Since Agri Stats would travel and present among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants and Producer Co-Conspirators at these regular meetings. And that is exactly what happened.

825.    At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.

826.    Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.

827.    Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-

to-date sales, which provides competitors with information on the price of their product "mix" of chickens versus the national average prices for the same "mix," ranking companies from "best" to "poorest" in terms of performance; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues, and costs.

828.    Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.

829.    Indeed, Agri Stats shipped copies of one Defendant's "books" to other Defendants on a number of occasions.

830.    Despite the impropriety of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable, nor were the "books" returned to Agri Stats.

831.    In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and Broilers account managers Paul Austin, Paul Bunting, and Dana Weatherford, regularly hosted, or presented at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.

832.    For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

833.    Mr. Donohue also helped forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory. At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."

[REDACTED]

836.    Among the thousands of such communications uncovered during discovery to date are the following examples, which are still being compiled in ongoing discovery:

837.    [REDACTED]

839. 

840.     Defendants rarely mentioned their exchange of information with one another through Agri Stats.

841.     However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly traded Defendants) noted the important role Agri Stats data plays in the industry.

842.     For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:

> Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now . . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets . . . . Typically in my experience the first cut is not enough.

Defendant Tyson similarly noted in a December 2014 investor presentation that:

[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats*. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)

843.     There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do.

844.     In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic principles establish that the routine exchange among competitors of such sensitive internal company information reduces competition.

845.     One chicken industry expert testified in a case against Defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

846.     When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors

of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

847.    A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

848.    A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them

confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**Z.     Plaintiffs' Claims are Timely**

849.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2016 or later. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiffs.

850.    And it was not until June 2020 with the Department of Justice's Colorado Indictment of executives of Defendants Claxton and Pilgrim's Pride that further evidence of the conspiracy became publicly known. It was not until October 7, 2020—when the Department of Justice issued its Superseding Indictment of six additional executives of Defendants Tyson, Koch, Pilgrim's Pride, and George's—that additional elements of Defendants' bid-rigging conduct involving broilers were revealed. The Colorado Indictments revealed that Defendants Claxton and Pilgrim's Pride aided the conspiracy by engaging in direct price fixing and specific bid rigging of broilers, which affected purchasers of large volumes of broiler chickens.

851.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

852. Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price.

853. For example, in a November 8, 2016, *Washington Post* article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants.

854. Not until November 10, 2016 was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.

855. The existence of this committee was not known to Plaintiffs, nor would Plaintiffs have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Committee meetings.

856. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

857. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, the Agri Stats coordination coupled with direct industry communications (at trade shows and via email/calls) denied Plaintiffs the opportunity to know of the conspiracy. Moreover, chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry. Plaintiffs also reasonably believed its contract partners to be dealing with them on fair and honest terms, and that they could justifiably rely on Defendants' representations regarding the Georgia Dock as being

truthful. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

858. Plaintiffs exercised reasonable diligence. Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

859. Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

860. Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiffs through fraudulent statements and omissions that the inflated prices of the Georgia Dock reflected actual market conditions.

861. The conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

862. Defendants and Co-Conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other, in furtherance of their conspiracy to restrain production while shielding their conspiracy from

detection or suspicion. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline"; and (3) on a July 2016 earnings call, Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

863. As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.

864. Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs. Defendants used these pretexts used to cover up the conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

865. During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.

866. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the

chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

867.     Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers. Some instances of these pretextual explanations by Defendants and their agents include:

- On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation by USDA will contribute to decrease corn suppliers next year."

- On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

- On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

- On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington DC and encouraged elected officials to end the "mistake" of the ethanol subsidy.

- In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

- On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

- On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn

being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

- In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."

- In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.

- On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

868.    To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an avian flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases, or artificially inflated chicken prices, on these factors rather than on Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

869.    Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and manipulate prices by anticompetitive means.

215

870.    For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.

871.    Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.

872.    Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.

873.    Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

874.    By virtue of Defendants and all of their Co-Conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

875.    Plaintiffs were members of the putative direct purchaser class action complaint asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, No. 1:16CV08637 (Dkt. No. 1) (N.D. Ill. Sept. 2, 2016).

876.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related case law during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

877.    The statute of limitations relevant to Plaintiffs' claims has also been tolled because it was not until June 2020 with the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride that the nature of Defendants' conspiracy to fix prices and rig bids of broilers was revealed.

## VIII.  ANTITRUST IMPACT

878.    During the relevant period, Plaintiffs, and, where applicable, their respective assignors, purchased substantial amounts of chicken from one or more Defendants.

879.    As a direct and proximate result of the Defendants' above-described illegal conduct, Plaintiffs, and, where applicable, their respective assignors, were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.

880.    As a direct and proximate consequence of the Defendants' above-described wrongful conduct, Plaintiffs, and, where applicable, their respective assignors, sustained substantial losses and damage to their businesses and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## IX. CLAIMS FOR RELIEF AND CAUSES OF ACTION

881.    The pertinent and relevant factual allegations set forth herein are incorporated into and re-alleged into each of the foregoing counts as appropriate to state a claim.

**COUNT I**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST ALL DEFENDANTS)**

882.    Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

883.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

884.     At least as early as January 1, 2008, and continuing until at least as late as 2019, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for and/or restrain supply of broilers, manipulation of the Georgia Dock benchmarking price, and rig bids and allocate markets for broilers, thereby creating anticompetitive effects.

885.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for broilers throughout the United States.

886.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.

887.     As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supra-competitive prices for broilers.

888.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

889.     Defendants' conspiracy had the following effects, among others:

Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in the United States;

Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

Plaintiffs, which directly purchased broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of broilers.

890. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers paid by Plaintiffs to be higher than it would be but for Defendants' conduct.

891. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid and will pay in the absence of the conspiracy.

892. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

893. Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no offsetting pro-competitive justifications.

## COUNT II
## VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION)

894. In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

895. Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices

charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

896.    Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

897.    As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

898.    As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

899.    Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

900.    Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no offsetting pro-competitive justifications.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enter joint and several judgments against Defendants in favor of Plaintiffs;

B.      Award Plaintiffs damages against Defendants in a joint and several judgment for an amount to be determined at trial to the maximum extent allowed under the claims stated above as well as treble damages, any other enhancement of damages, attorneys' fees, expenses, and costs as provided by law;

C.      Award Plaintiffs their post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

D.      Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law, including the federal antitrust laws; and

E.      Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

F.      Grant Plaintiffs such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 26, 2020

Respectfully submitted,

L. HART, INC.; R & D MARKETING, LLC,
TIMBER LAKE FOODS, INC.; AND EMA
FOODS CO., LLC

By: /s/   *Paul J. Ripp*

Paul J. Ripp
**WILLIAMS MONTGOMERY & JOHN LTD.**
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
pjr@willmont.com

Charles E. Tompkins (*pro hac vice* forthcoming)
**WILLIAMS MONTGOMERY & JOHN LTD.**
1607 22nd Street, NW, Suite 300
Washington D.C. 20008
Telephone: (202) 791-9951
Facsimile: (312) 630-8586
cet@willmont.com

W. Lawrence Deas (*pro hac vice* forthcoming)
**LISTON & DEAS PLLC**
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Telephone: (601) 981-1636
Facsimile: (601) 982-0371
Lawrence@listondeas.com

Michael Gratz, Jr. (*pro hac vice* forthcoming)
**GRATZ & GRATZ, P.A.**
312 N. Green Street
Tupelo, MS 38804
Telephone: (662) 844-5531
Facsimile: (662) 844-8747
michael@gratzandgratz.com